Gary G. GOJMERAC and Pamela Gojmerac,
Plaintiffs-Appellants,

v.

James R. MAHN and Sandra Mahn, Defendants-
Respondents.

Court of Appeals

*No. 01–0825. Oral argument November 12, 2001.—Decided
December 4, 2001.*

2002 WI App 22

(Also reported in 640 N.W.2d 178.)

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs and oral argument of *James Wedemeyer* of *Schmitt & Koppelman, S.C.* of Merrill.

On behalf of the defendants-respondents, the cause was submitted on the brief and oral argument of *George G. Russell* of *Russell & Tlusty* of Merrill.

Before Cane, C.J., Hoover, P.J., and Peterson, J.

¶ 1. CANE, C.J. Gary and Pamela Gojmerac appeal from a portion of a judgment declaring that owners of numerous subdivision lots have a valid easement for ingress and egress over the western portion of the Gojmeracs' property.[1] We conclude that only those lots that were part of the dominant estate at the time

---

[1] James and Sandra Mahn cross-appealed; the cross-appeal was voluntarily dismissed, pursuant to WIS. STAT. RULE 809.18 (1999–2000).

the easement was created are entitled to use the easement. The two lots that were not part of the dominant estate do not have a valid easement. Therefore, we affirm in part and reverse in part the portion of the judgment declaring the rights of the owners of particular lots. Because neither party challenges the court's other rulings, the remainder of the judgment is affirmed.

## BACKGROUND

¶ 2.    In 1975, Paul and Helen Smith dedicated and recorded a plat called the Birch Acres Addition.[2] The addition was bordered on the east by Big Eddy Road and on the south by Birch Hill Road. Vacant, land bordered the addition on the north and west.

¶ 3.    The addition contained two blocks of lots of varying sizes divided by a public road. The public road, approximately sixty feet wide, ran north from Birch Hill Road and then curved west, where it was to terminate in a cul-de-sac. Block One, west and south of the public road, contained five lots, numbered 1 through 5. Block Two, located east and north of the public road, contained seven lots, numbered 1 through 7.

¶ 4.    The layout of the addition has remained the same since 1975, although some landowners own more than one lot and others own partial lots. A total of nine

---

[2] To assist the reader, we have prepared a diagram of the addition, which we have attached as Exhibit A. We stress that this exhibit is our drawing based on the parties' briefs, oral argument and the appellate record. It is not an exhibit from the trial court proceedings, nor is it drawn to scale. Rather, it is a simplified diagram of the lots and easement at issue.

lots abut what was platted as the public road. Starting at the intersection of the public road and Birch Hill Road, the lots running north and curving west along the road are Lots 3, 2, 1 and 5 of Block One on the west (in that order), and Lots 3, 4, 5, 6 and 7 of Block Two on the east (in that order). Lot 4 of Block One is located directly west of Lots 2 and 3 of Block One. Lots 1 and 2 of Block Two are located directly east of Lots 3 and 4 of Block Two, and they abut Big Eddy Road on the east.

¶ 5.   The public road was never paved, but a gravel and dirt road less than sixty feet wide exists in its place. For instance, where the road intersects Birch Hill Road, it is no more than forty-one feet wide. The remaining width of the road is wooded.

¶ 6.   At the Smiths' request, the public road was vacated on September 26, 1990, and is now a private road. On October 2, 1990, the Mahns' son, David, purchased property from the Smiths, including Lots 1, 2, 5 and part of 4, all in Block One. David also purchased the recently vacated road located between Blocks One and Two, and received a right of first refusal to purchase Lots 6 and 7 of Block Two.

¶ 7.   David subsequently purchased Lots 3 and 4 of Block Two. Lot 3 is located on the northeast corner of the intersection of the vacated road and Birch Hill Road. David constructed a home on Lot 3 and decided to sell it. In order to give the future owners full use of a circular driveway and to increase the lot size, David sold a portion of the vacated road along with Lot 3.

¶ 8.   On July 28, 1995, the Gojmeracs purchased from David Lot 3 of Block Two and a 180–foot-long, forty-one-foot-wide portion of the vacated road located

directly west of Lot 3. David and his wife, the grantors, reserved an easement:

> Grantors reserve a perpetual easement for purposes of ingress and egress over that portion of the vacated road formerly lying between Block One (1) and Block Two (2) of Birch Acres Addition described above. Said easement includes the right to install utilities. Maintenance of the easement shall be maintained by the grantor.

David reserved the easement so that he could continue to travel from his remaining lots to Birch Hill Road via the vacated road (the Gojmeracs' forty-one-foot-wide strip was the only portion of the road that was passable where the vacated road met Birch Hill Road).[3]

¶ 9.  On the day the easement was created, David owned the following property that abuts the vacated road:  Lots 1, 2 and 5 of Block One and Lot 4 of Block Two. David was also in the process of negotiating the purchase of additional land from the Smiths. That purchase was completed on November 15, 1995, when David bought Lots 5, 6 and 7 of Block Two.

¶ 10.  After purchasing Lots 5, 6 and 7 of Block Two, David owned all land abutting the vacated road except Lot 3 of Block One, which is located on the northwest corner of the intersection of the vacated road and Birch Hill Road, and Lot 3 of Block Two, now owned by the Gojmeracs.

¶ 11.  In 1996 and 1997, David sold three of the lots that abut the vacated road. David sold Lot 4 of Block Two (as well as Lot 2 of Block Two) to Michael and Larana Broeren, who can access Big Eddy Road on

---

[3] Although David had to travel over the Gojmeracs' land if he used the vacated road to access Birch Hill Road, he was also able to access Birch Hill Road from his property using a less-developed logging road located west of Block One.

the east. David sold Lot 5 of Block Two to Robert Kobialka, who also has access to Big Eddy Road on the east. Finally, David sold Lot 2 of Block One to John Cirilli, who accesses Birch Hill Road using a driveway over Cirilli's other property, Lot 3 of Block One.

¶ 12.  In 1998, David encountered financial problems. He sold all of his land in the Birch Acres Addition, including Lots 1, 5 and part of 4 in Block One and Lots 6 and 7 of Block Two, to River Valley State Bank, which then sold the same property to David's parents, James and Sandra Mahn. David, however, continued to manage the property for his parents and constructed a home on Lot 6 and part of Lot 7 of Block Two.

¶ 13.  At some point, the Gojmeracs became troubled by the Mahns' (i.e., David's) use of the easement over the Gojmeracs' land. In 1998, the Gojmeracs filed this suit seeking an injunction barring the owners of Lots 6 and 7 of Block Two from using the easement.

¶ 14.  On April 30, 1999, while this suit was pending, the Mahns sold the home located on Lot 6 and part of Lot 7 of Block Two to John and Jessica Pelka. As part of this sale, the Mahns granted the Pelkas an easement to use all portions of the vacated road that the Mahns still owned to access Birch Hill Road, including the nineteen-foot-wide strip of wooded land adjacent to Birch Hill Road. In a separate document, entitled "Easement," the Mahns gave the Pelkas an easement over the Gojmeracs' 180–foot-long, forty-one-foot-wide strip of land. The Mahns and the Pelkas signed the document.

¶ 15.  The Gojmeracs objected to the Pelkas' use of their land to access Lots 6 and 7 of Block Two, just as they had objected to the Mahns' use of the easement to access those same lots. They contended that although the Mahns could use the easement to access their

9

remaining lots in Block One, the easement did not extend to Lots 6 and 7 of Block Two. The litigation concerning this issue continued, and a bench trial was held on September 13, 2000.

¶ 16.  The trial court decided that the Pelkas could use the easement over the Gojmeracs' property.[4] Specifically, the judgment stated that the easement could be used for ingress and egress by Lots 1, 2 and 5 of Block One, and Lots 4, 6 and 7 of Block Two. The judgment also stated that the lots in Blocks One and Two could not be further subdivided to create additional lots that would use the easement, and that the easement cannot be used to access fifteen acres of undeveloped land located west of Block One. This appeal followed.

## ISSUES

¶ 17.  The Gojmeracs contend that Lots 1, 2 and 5 of Block One and Lots 5, 6 and 7 of Block Two "are not appurtenant to the servient estate" and, therefore, are not entitled to use the easement. The Mahns dispute this assertion, contending that the "lots are appurtenant to the easement because the Mahns had an interest in said lots and the discontinued roadway at the time the easement was created." Because easements are generally said to be appurtenant, or annexed, to a dominant estate, as opposed to other lots or to a servient estate, it became clear to this court that the

[4] The trial court also considered a counterclaim by the Mahns that sought an injunction preventing the Gojmeracs from interfering with the Mahns' use of the easement. The court dismissed the counterclaim, concluding that an injunction was not necessary. The Mahns do not challenge that ruling on appeal and, therefore, their counterclaim will not be addressed further.

10

parties are using the term "appurtenant" to mean adjacent to, or abutting. This conclusion was confirmed at oral argument. Resolution of this case provides us with an opportunity to clarify the meaning of the word "appurtenant" and to address whether dominant and servient estates must be adjacent to one another.

APPLICABLE LAW

¶ 18.   We begin by restating general easement law. An easement is an interest in land possessed by another. *See Atkinson v. Mentzel*, 211 Wis. 2d 628, 637, 566 N.W.2d 158 (Ct. App. 1997). Easements are of two classes, appurtenant easements and easements in gross. *See Union Falls Power Co. v. Marinette County*, 238 Wis. 134, 138, 298 N.W. 598 (1941). "Appurtenant" means that the rights or obligations of a servitude are tied to ownership or occupancy of a particular unit or parcel of land. RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 1.5 at 30 (2000). "In gross" means that the benefit or burden of a servitude is not tied to ownership or occupancy of a particular unit or parcel of land.[5] *Id.*

¶ 19.   An appurtenant easement creates two distinct property interests:   the dominant estate (or tenement), which enjoys the privileges granted by an easement; and the servient estate (or tenement), which permits the exercise of those privileges. *See Atkinson*, 211 Wis. 2d at 637; *see also Reise v. Enos*, 76 Wis. 634,

---

[5] Interests that are held in gross may be either transferable or personal. RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 1.5 cmt. b at 32 (2000). They do not run with land and are transferred by assignment or delegation. If personal, they are not transferable. *Id.*

638, 45 N.W. 414 (1890) (particular lot to which the easement is appurtenant is the dominant estate and lot over which the easement is enjoyed is the servient estate).[6] The dominant owner does not obtain an estate in the servient property, but only a right to use the land consistent with the general property rights of the servient owner. *See Hunter v. McDonald*, 78 Wis. 2d 338, 344, 254 N.W.2d 282 (1977).

¶ 20.  Although dominant and servient estates are often adjacent to one another, the majority rule is that an easement may be appurtenant to noncontiguous property if both estates are clearly defined and if it was the parties' intent that the easement be appurtenant. *See Verzeano v. Carpenter*, 815 P.2d 1275, 1278 (Or. App. 1991); *see also* 7 THOMPSON ON REAL PROPERTY § 60.02(f)(4) (1994) ("In an easement appurtenant, the servient tenement need not necessarily be adjacent to land it serves (for example, there might be an easement over servient tenement parcel a, through servient tenement parcel b, to reach dominant tenement parcel c)".).

■

¶ 21.  Although we are aware of no Wisconsin case that has directly addressed whether an easement may be appurtenant to nonadjacent property, our courts have recognized easements where the dominant and servient estates are not adjacent. *See, e.g., Millen v. Thomas*, 201 Wis. 2d 675, 679–80, 550 N.W.2d 134 (Ct. App. 1996) (dominant and servient estates separated by road). Accordingly, in the absence of contrary authority, we apply the majority rule.

---

[6] BLACK'S LAW DICTIONARY provides a definition of the word "appurtenant" that is consistent with *Reise v. Enos*, 76 Wis. 634, 45 N.W. 414 (1890):  "Annexed to a more important thing." BLACK'S LAW DICTIONARY 98 (7th ed. 1999). Thus, it is said that an easement is appurtenant, or annexed, to the dominant estate.

¶ 22.    It is the essence of an appurtenant easement that it exists for the benefit of the dominant estate alone. *See Vliet v. Sherwood*, 35 Wis. 229, 235 (1874). Thus, an easement can be used only in connection with the dominant estate to which it is appurtenant. *See S.S. Kresge Co. v. Winkelman Realty Co.*, 260 Wis. 372, 376, 50 N.W.2d 920 (1952); *see also* RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 4.11 at 619 (2000) .

¶ 23.    Additionally, the dominant estate cannot be enlarged. In *Reise*, 76 Wis. at 639, our supreme court explained:

> [The easement is] appurtenant to lot 3, to which it is annexed, and cannot be enjoyed separate and distinct from the lot to which it belongs. Nor could [the owner of lot 3], to whom the right was originally granted, enlarge the right, and subject the servient estate to a new species of burden. . . . [I]t is well settled that, if a person has a right of way over the land of another to a particular close, he cannot enlarge it or extend it to other closes.

*See also* 28A C.J.S. *Easements* § 10 at 183 (1996) ("An easement appurtenant may not be extended by the owner of the dominant estate to accommodate other lands which he may own and for which the easement was not originally intended."). Further, an easement cannot be enlarged to include property acquired after the creation of the dominant estate. *See* RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 4.11 cmt. b at 620 (2000) (Unless the easement was intended to benefit land to be acquired in the future, the easement beneficiary is not entitled to use it to serve land that is

subsequently acquired even if no additional use of the easement or burden on the servient estate would ensue.).

¶ 24.  The deed granting the easement defines the relative rights of the landowners. *See Hunter*, 78 Wis. 2d at 342–43. "The use of the easement must be in accordance with and confined to the terms and purposes of the grant." *Id.* at 343. If the language within the four corners of the deed is unambiguous, the court need not look further for the parties' intent. *See Rikkers v. Ryan*, 76 Wis. 2d 185, 188, 251 N.W.2d 25 (1977). Whether the deed's language is ambiguous is a question of law and will be reviewed de novo. *See Atkinson*, 211 Wis. 2d at 638.

¶ 25.  Where an easement is appurtenant to an estate, it follows every part of the estate into the hands of those who purchase or inherit the estate, as long as the burden on the servient estate is not increased.[7] *See Reise*, 76 Wis. at 639; *see also* 25 Am. Jur. 2d *Easements & Licenses* § 105 at 676 (1996) (As a general rule, if the dominant estate is transferred in separate parcels to different persons, each grantee acquires a right to use easements appurtenant to the dominant estate, provided that the easements can be enjoyed as to the separate parcels without any additional burden on the servient estate.). An easement passes by a subsequent

---

[7] *Reise* refers to an *increased* burden, but more recent caselaw considers whether a servient estate has been *unreasonably* burdened. *See Hunter v. Keys*, 229 Wis. 2d 710, 715, 600 N.W.2d 269 (Ct. App. 1999). Because resolution of this case does not require us to examine any changes in the burden on the servient estate, we decline to address whether this change in language signifies a change in the applicable legal analysis.

conveyance of the dominant estate without express mention in the conveyance. *In re Land on Geneva Lake*, 165 Wis. 2d 235, 245, 477 N.W.2d 333 (Ct. App. 1991).

DISCUSSION

¶ 26. Application of these principles leads us to conclude that Lots 6 and 7 of Block Two were never part of the dominant estate and, therefore, the easement was never appurtenant, or annexed, to those two lots. Accordingly, the owners of Lots 6 and 7 of Block Two have no right to use the easement. Furthermore, we conclude that the easement is appurtenant to Lots 1, 2 and 5 of Block One and Lot 4 of Block 2 because these lots are part of the dominant estate. Therefore, the owners of those lots have a right to use the easement, unless and until the Gojmeracs prove that the easement should be extinguished for a particular, recognized reason, such as that the use has increased the burden on the servient estate.

### A. Identity of the dominant estate

¶ 27. It is undisputed that the easement is the right to ingress and egress over the forty-one-foot-by-180–foot strip of land that forms the western edge of the Gojmeracs' property. The servient estate is the Gojmeracs' property. The disputed issue is the identity of the dominant estate.

¶ 28. The parties disagree whether the deed language establishing the easement is ambiguous. The Gojmeracs assert that the language is unambiguous and clearly implies that the dominant estate is the land adjacent to Lot 3 of Block Two that was owned by David Mahn at the time he sold Lot 3 to the Gojmeracs. Under

15

the Gojmeracs' analysis, the dominant estate contains Lots 1, 2 and 5 of Block One, the vacated road, and Lot 4 of Block Two.

¶ 29.   The Mahns disagree, contending that the deed is ambiguous because it does not specifically identify the dominant estate. The Mahns urge this court to look at extrinsic evidence of the parties' intent, including facts found by the trial court. They argue that these facts prove that the dominant estate was intended to include the same lots identified by the Gojmeracs, as well as the two lots on which the Mahns had a right of first refusal:   Lots 6 and 7 of Block Two.

¶ 30.   We conclude that the deed is not ambiguous. Although the dominant estate is not explicitly identified in the deed, the obvious meaning of the language is that David intended to use the easement to access the chunk of land adjacent to Lot 3 of Block Two from which Lot 3 was being separated. The parties agree that the dominant estate contains Lots 1, 2 and 5 of Block One, the vacated road, and Lot 4 of Block Two. The only dispute is whether Lots 6 and 7 of Block Two were also intended to be part of the dominant estate. We conclude that they were not.

¶ 31.   The RESTATEMENT provides:   "[I]f the intent to benefit land owned by another, or land to be acquired in the future, is not clearly apparent, the usual presumption . . . is that the dominant estate is limited to land owned by the grantee at the time the easement . . . is created." *See* RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 4.11 cmt. b at 620 (2000). We conclude that application of this presumption is consistent with Wisconsin law. *See, e.g., Hunter*, 78 Wis. 2d at 342–43 (We look to the easement to construe the relative rights of

16

the landowners; the use of the easement must be in accordance with and confined to the terms and purposes of the grant.).

¶ 32. The Mahns further assert that a right of first refusal to purchase property is equal to an ownership interest in property. We disagree. First, the Mahns were unable to provide us with any authority for that proposition. Our independent research has revealed no Wisconsin case directly on point, although language in *Reise* suggests that a court generally expects that a party has already acquired title to a piece of property when the party asserts easement rights associated with the property. *See id.*, 76 Wis. at 637 (noting that an easement cannot be enlarged so that it can be used or maintained in connection with any other lot to which a party subsequently acquires a title).

¶ 33. Second, the definition of a right of first refusal contradicts the Mahns' assertion that the right is equal to an ownership interest. "A right of first refusal is essentially a conditional option dependent upon the decision or the desire of the [landowner] to sell." *Last v. Puehler*, 19 Wis. 2d 291, 297, 120 N.W.2d 120 (1963). It is distinguishable from an ordinary option in that it provides the prospective purchaser the right to buy upon specified terms only if the seller decides to sell. *Edlin v. Soderstrom*, 83 Wis. 2d 58, 68, 264 N.W.2d 275 (1978). Given these definitions, we cannot agree that land on which David had a right of first refusal was land "owned by the grantee at the time the easement" was created. *See* RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 4.11 cmt. b at 620 (2000).

¶ 34. Applying the presumption that the dominant estate is limited to land owned by the grantee at

the time of the easement's creation unless the deed manifests a clear intent to include future purchases in the dominant estate, we conclude that Lots 6 and 7 of Block Two are not part of the dominant estate. Here, the deed lacks any specific reference to Lots 6 and 7 or to future land purchases. Accordingly, the deed provides no notice of intent to include future land purchases in the dominant estate, and does not even mention that David has a right of first refusal on other land. There is no "clearly apparent" intent to include in the dominant estate lands that David has not yet purchased. *See id.*

¶ 35.   The only reasonable interpretation of the deed as written is that the dominant estate includes those lands David owned at the time of the sale. Accordingly, we conclude that Lots 6 and 7 of Block Two are not entitled to use the easement because they were never part of the dominant estate, which, by law, cannot be expanded. *See S.S. Kresge*, 260 Wis. at 376; *Reise*, 76 Wis. at 639. In other words, the easement was never appurtenant to Lots 6 and 7.

### B. Whether division of the dominant estate affects easement rights

¶ 36.   We must next decide whether, as a matter of law, the owners of Lot 2 of Block One and Lot 4 of Block Two can use the easement.[8] Both lots were part of the dominant estate when the easement was created and

---

[8] Although the parties recognize that the owners of Lot 2 of Block One and Lot 4 of Block Two are not currently using the easement because their other lots provide access to Birch Hill Road and Big Eddy Road, the judgment addresses the rights of those landowners, explicitly stating that these two lots may use the easement. The Gojmeracs have appealed that conclusion.

were part of a single parcel owned by David. The fact that the lots have now been sold separately to different landowners does not, as a matter of law, affect the landowners' rights to continue to use the easement. The RESTATEMENT explains, in part:

> When property benefited or burdened by a servitude is divided into separately owned parcels, the rights and obligations that run with each of the separately owned parcels are as follows unless the terms of the servitude provide otherwise:

> (1) Each separately owned parcel is entitled to make the uses privileged by an easement or profit; provided, however, that if apportionment is required to avoid an unreasonable increase in the burden on the servient estate, the use rights are appropriately apportioned among the parcels.

RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 5.7 at 50–51 (2000). Although we have been directed to no Wisconsin authority for this proposition, our review of cases from other jurisdictions convinces us that the RESTATEMENT correctly states the law. *See, e.g., Crawford Realty Co. v. Ostrow*, 150 A.2d 5, 19 (R.I. 1959) (If a dominant tenement is subdivided between two or more owners, the easements appurtenant to it become subdivided and attach to each separate part of the subdivided dominant tenement unless this result is prohibited by the terms of its conveyance.).

Accordingly, it is appropriate that we address the legal status of Lot 2 of Block One and Lot 4 of Block Two. We note, however, that our decision is based only on the facts available at this time. If, for example, the owners of these two lots begin using the easement and there is an issue of increased burden, the Gojmeracs remain able to challenge the landowners' use of the easement on that basis.

¶ 37.    The Gojmeracs do not appear to dispute the proposition that a dominant estate can be subdivided, but they contend that only those subdivided pieces that are "appurtenant to the servient estate" can continue to use the easement. It is clear from the context of this statement, as well as from oral argument, that the Gojmeracs are using the term "appurtenant" synonymously with "abutting" or "adjacent." Their argument, therefore, is that subdivided parcels of the dominant estate that are not adjacent to the servient estate cannot use the easement.

¶ 38.    The Gojmeracs rely on *Reise*, stating that the case is instructive as to what constitutes "appurtenant." *Reise* involved three parcels of land. *See Reise*, 76 Wis. at 635–37. Lot 4 was bordered by Clinton Street on the west. The owner of Lot 4 sold to Reise Lot 3, located directly east of Lot 4. The owner granted Reise an easement over Lot 4 so that Reise could access Clinton Street. Six years later, Reise purchased Lot 2, located directly east of Lot 3. Seventeen years after purchasing Lot 2, Reise sold Lot 3, reserving to himself the right to cross Lot 3 to reach Lot 4, which he would then cross to access Clinton Street. *Id.*

¶ 39.    Francis Enos bought Lot 4. *Id.* at 637. Enos objected to Reise's use of Lot 4 access Clinton Street and tried to block Reise's access, which led to litigation. *See id.* at 634. The court concluded that when Lot 3 was conveyed to Reise, the easement was appurtenant to Lot 3. *See id.* at 637. Furthermore, *Reise* stated, the right to use the easement over Lot 4 to access Clinton Street "cannot be enlarged so that it can be used or maintained in connection with any other lot to which [Reise] subsequently acquired a title [because the easement] was to be enjoyed by the owner of [L]ot 3, and could not be applied to another estate." *See id.* There-

fore, the court concluded that Reise had no right to use the easement over Lot 4 except as the owner of Lot 3. *See id.* at 639.

¶ 40.   The Gojmeracs argue that *Reise* supports their position that only land adjacent to a servient estate can use an easement over the servient estate, stating, "The *Reise* Court held that the right of way across Lot 4 was only appurtenant to Lot 3 and was not to Lot 2." The Gojmeracs' summary of *Reise* is correct, except to the extent that the Gojmeracs use the term "appurtenant" to mean "adjacent to." *Reise* concluded that Lot 2 could not use the easement because Lot 2 was never part of the dominant estate—not because Lot 2 was never adjacent to the easement. Therefore, we disagree that *Reise* supports the Gojmeracs' position.

¶ 41.   The Gojmeracs also rely on *Millen*'s discussion of *Reise*, arguing *Millen* held that only those portions of the dominant estate that are adjacent to, or abutting, the servient estate can use an easement. We reject this argument. The facts in *Millen* were similar, but not identical, to those in *Reise*. The landowner of the dominant estate acquired additional land abutting the dominant estate. *See Millen*, 201 Wis. 2d at 681. The servient estate sought a declaration that the easement was void because the landowner had "illegally expanded" the dominant estate. *Id.* at 682, 683. *Millen* rejected the servient estate's assertion that the mere purchase of additional land extinguished the easement, stating:   "We do not read *Reise* to say that if additional property is added onto the land which is appurtenant to the easement, the easement ceases to exist. Rather, *Reise* merely requires the easement to be appurtenant to the dominant estate." *Id.* at 685.

¶ 42. The Gojmeracs interpret this last sentence to mean that an easement must be adjacent to, or abutting, the servient estate. We disagree. The court in *Millen* was not called upon to address the situation where the dominant estate is divided. Instead, *Millen* contemplated whether the purchase of additional land adjacent to a dominant estate extinguishes the easement as a matter of law. *See id.* at 683. Thus, *Millen* never addressed the issue of whether only those portions of the dominant estate adjacent to, or abutting, the servient estate can use an easement.

¶ 43. Additionally, although there is no case on point in Wisconsin, persuasive authority from other jurisdictions suggests that even if the division of a dominant estate results in certain parcels no longer abutting the servient parcel, the easement is not *automatically* extinguished as to those parcels. For example, *Crawford* stated that the subdivided parcels of a dominant estate can continue to use the easement "even where . . . the subdivision separates one of the subdivided parts from the passageway." *See Crawford,* 150 A.2d at 19; *see also Krause v. Taylor,* 343 A.2d 767, 769 (N.J. Super. Ct. 1975) ("Except as limited by the terms of its creation or transfer and subject [to concerns regarding the increased burden on the servient estate], a subsequent owner of a part of the dominant estate to which a right of way is appurtenant has the right to use such right of way to his particular part of the land, even though his subdivided parcel does not abut upon such way.").

¶ 44.   *Crawford* is consistent with the general majority rule, which we apply here, that the dominant and servient estates need not be adjacent. *See* 7 THOMPSON ON REAL PROPERTY § 60.02(f)(4) (1994) ("In an easement appurtenant, the servient tenement need not necessarily be adjacent to land it serves.").

¶ 45.   According to *Crawford*, an easement is not automatically extinguished when the division of a dominant estate creates parcels of land that no longer abut the servient estate. *Crawford* recognized, however, that an easement may no longer be available in some circumstances:   "If the land is so divided that a portion thereof is completely deprived of access to the passageway, the easement can no longer be used for the benefit of the subdivided portion and thus it is extinguished." *Crawford*, 150 A.2d at 20. Additionally, *Reise* recognized that an easement may be limited if the burden on the servient estate is increased. *See Reise*, 76 Wis. at 639.

¶ 46.   Here, the Gojmeracs do not assert that the terms of the deed contemplate terminating the easement when a portion of the dominant estate no longer abuts the servient estate. Also, they do not argue that Lot 2 of Block One and Lot 4 of Block Two are completely deprived of access to the easement (because they can access the easement using the remainder of the vacated road). Finally, they have not alleged that easement use by those two lots has increased the burden on their servient estate. Accordingly, there is no reason to extinguish the easement as to Lot 2 of Block One and Lot 4 of Block Two.

¶ 47. In summary, we conclude that Lot 2 of Block One and Lot 4 of Block Two have a right to use the easement until such time as the Gojmeracs prove that the easement should be extinguished for a particular, recognized reason, such as that the use has increased the burden on the servient estate.

### C. Use of the easement by Lots 1 and 5 of Block One

■

¶ 48. Although the Gojmeracs do not object to the Mahns' use of the easement for ingress to and egress from Lots 1 and 5 of Block One, they suggest that the easement will no longer be valid as to those lots if the Mahns sell the lots or the vacated road connecting the lots to the servient easement. For the same reasons articulated with respect to Lot 2 of Block One and Lot 4 of Block Two, we conclude that any subsequent owners of parcels that were originally part of the dominant estate would not automatically be prohibited from using the easement. As with Lot 2 of Block One and Lot 4 of Block Two, use of the easement to access Lots 1 and 5 of Block One would be permitted until such time as the Gojmeracs prove that use of the easement should be extinguished for a particular, recognized reason, such as that the use has increased the burden on the servient estate.

### CONCLUSION

¶ 49. We reverse the trial court's conclusion that Lots 6 and 7 of Block Two have the right to use the easement over the Gojmeracs' land. We affirm the judgment in all other respects.

---

---

*By the Court.*—Judgment affirmed in part; reversed in part. Costs denied to both parties.