AKG REAL ESTATE, LLC, a limited liability company, Plaintiff-Appellant-Cross-Respondent,

v.

Patrick J. KOSTERMAN and Susan A. Kosterman, Defendants-Respondents-Cross-Appellants.†

Court of Appeals

*No. 04–0188. Submitted on briefs September 23, 2004.—Decided November 3, 2004.*

2004 WI App 232

(Also reported in 691 N.W.2d 711.)

† Petition to review granted 1-11-2005.

510

On behalf of the plaintiff-appellant-cross-respondent, the cause was submitted on the briefs of *Robert E. Hankel* of *Hartig, Bjelajac, Hankel & Koenen* of Racine.

On behalf of the defendants-respondents-cross-appellants, the cause was submitted on the briefs of *Daniel Kelly* of *Reinhart Boerner Van Deuren S.C.* of Milwaukee.

Before Anderson, P.J., Brown and Snyder, JJ.

¶ 1. BROWN, J. In this easement dispute, the issue is whether an easement may continue to exist

even after changed conditions make the purpose of the easement obsolete. In *Millen v. Thomas*, 201 Wis. 2d 675, 679, 550 N.W.2d 134 (Ct. App. 1996), we said in dicta that an easement may be terminated by completion or cessation of the particular purpose for which it was granted. With the issue squarely before us, we now hold this to be the law. In this case, allowing continued existence of an easement, whose original purpose was ingress and egress to a landlocked property—and which is no longer necessary—would unreasonably restrict the beneficial use of vacant land. As a matter of public policy, courts cannot endorse allowing the easement holder to "hold out" for reasons not contemplated by the easement. To do so would be to sanction economic waste. We affirm the trial court's decision in part and reverse in part.

¶ 2.   Some time prior to 1960, Louis and Angeline Chvilicek bought roughly eighty acres of vacant land on Highway 31 in Racine county's town of Caledonia. On August 25, 1960, they deeded four acres of that property (the Homestead) to their son Edward Chvilicek and his wife Audrey. The Homestead is located some 800 feet back from Highway 31 and landlocked. The deed, which Edward and Audrey recorded on September 13, included a thirty-foot-wide easement of right-of-way over the retained parcel (the Vacant Land) for ingress and egress between the Homestead and Highway 31.[1]

¶ 3.   The following year, 1961, the elder Chviliceks granted Edward and Audrey a second easement along the same path. This easement was sixty-six feet in width. The parties intended the expansion to allow for conversion of the easement into a public road in the

---

[1] This ancient thirty-foot easement is not the subject of either party's appeal.

512

event that they ever wished to dedicate it. Edward and Audrey recorded their deed on May 8. Before the close of 1961, Louis passed away. After his death, Angeline conveyed the Vacant Land to her children and their spouses as tenants in common. Edward and Audrey received a fifty-percent interest in the property. Joyce and Vincent White, Edward's sister and brother-in-law, received the remaining fifty percent.

¶ 4. AKG Real Estate, LLC made an offer to purchase the remainder of the Vacant Land, comprising some 79.736 acres, on September 11, 1997. The Chviliceks and Lorraine I. White, trustee of the Vincent J. White trust, countered that offer, offering to sell the Vacant Land subject to three easements. The first was a thirty-foot private road easement located along the path of the 1961 easement, "until such time as public road access is made available to said parcel." It also included a vehicular easement for ingress and egress on Louis Drive, located to the north of the easement path and running roughly parallel to the portion of the easement at issue in this case, and a twenty-foot-wide sanitary sewer easement extending toward Louis Drive.

¶ 5. The deal proceeded, and closing occurred in January 1998. AKG received two deeds:  one from the Chviliceks and one from White, each conveying a one-half undivided interest in the property. AKG recorded the deeds on January 16, 1998. The deeds, like the counteroffer, included three easements: one for the sanitary sewer, one for ingress and egress on Louis Drive, and one thirty-foot easement following the path of the 1961 easement. The relevant language in both deeds reads:

> Reserving therefrom a private road easement for the benefit of EDWARD T. CHVILICEK and AUDREY M. CHVILICEK, husband and wife, their heirs and as-

513

signs, or subsequent owners of 4213 Highway 31, Racine, Wisconsin 53405, [the Homestead], until such time as public road access is made available for said real estate upon the following described easement of right of way, to wit: [legal description of the thirty-foot easement].

¶ 6. The record does not reflect exactly when AKG formulated plans to convert the Vacant Land into a subdivision. However, it is apparent that it had such intentions prior to its purchase of the land. The record reflects that in November 1997, two months prior to the January 1998 closing date, the planning commission for the town of Caledonia put on its meeting agenda the rezoning to R-2S (residential) of 31.049 acres of the Vacant Land. AKG was able to accomplish this rezoning with the cooperation of Edward. Indeed, AKG's offer was contingent upon rezoning the property, and rezoning was also a requirement of the closing.

¶ 7. Between 1998 and 2000, AKG began the initial planning phase for its new subdivision. It contacted both the planning and development commission of Racine county and the town of Caledonia about some of their development ideas to ascertain what sorts of plans would be feasible. During the early part of 2000, AKG hired RSV Engineering, Inc. to perform engineering services related to the proposed development.

¶ 8. As AKG planned, two noteworthy changes occurred during the same time frame. First, ch. 233 of the Department of Transportation regulations in the WIS. ADMIN. CODE, entitled "DIVISION OF LAND ABUTTING A STATE TRUNK HIGHWAY OR CONNECTING HIGHWAY," went into effect on February 1, 1999. WISCONSIN ADMIN. CODE § TRANS 233.012(1) (2004) made this chapter applicable to all land divisions created by plat or map, including AKG's proposed subdivi-

sion.[2] Section TRANS 233.03(2) authorizes the DOT to review preliminary and final plats. WISCONSIN ADMIN. CODE § TRANS 233.06 imposes restrictions on the frequency of connections or access points onto state highways.[3] Its provisions read as follows:

> **(1)** The land division shall be laid out with the least practicable number of highways and private roads or driveways connecting with abutting state trunk highways or connecting highways.

> **(2)** The department shall determine a minimum allowable distance between connections with the state trunk highway or connecting highway, between any 2 highways within the land division and between a highway within the land division and any existing or planned highway. To the extent practicable, the department shall require a distance of at least 1,000 feet between connections with a state trunk highway or connecting highway.

Second, the Homestead changed ownership on March 30, 2000, when the Chviliceks sold the property to Patrick J. and Susan A. Kosterman.

¶ 9.  The record reflects that at some point during this initial planning phase in 2001, AKG met with two members of the Racine county planning commission, Arnie Clement and Julie Anderson. At the time, AKG's concept map included four lots where four AKG members intended to make their homes. Clement and Anderson opined that the DOT would not approve the

---

[2] The 2004 version is substantively the same as the original. All subsequent references to the Wisconsin Administrative Code will be to the 2004 version, unless noted otherwise.

[3] Both parties agree that the DOT has suspended parts of WIS. ADMIN. CODE ch. TRANS 233, including WIS. ADMIN. CODE § TRANS 233.03(2). However, neither represents that WIS. ADMIN. CODE § TRANS 233.06 is no longer effective.

proposed drawing, because it contemplated as an access point to Highway 31 a roadway along the easement path servicing the Homestead. This was problematic, they said, because the easement path was too close to Valley Road to the south. Valley Road is a public road running roughly parallel to the easement path and Louis Drive.

¶ 10. The parties do not tell us how close Valley Road lies to the easement path, but based on a map in the record, we presume it to be less than five hundred feet. The map shows Valley Road, the easement path, and Louis Drive, from left to right. Where the three roads intersect with Highway 31, the easement path lies noticeably closer to Valley Road than to Louis Drive. The record contains conflicting measurements of the distance between the easement path and Louis Drive. We have figures ranging from "less than 300 feet," 400 feet, and roughly 500 feet. In any case, the distance between Valley Road and the easement path must be shorter.

¶ 11. The RSV engineer testified in his deposition that in his experience with the DOT, it prefers 1000 feet between connections but as a rule of thumb generally tolerates as few as 600 feet. He indicated that this general rule for variances appears to be uniform throughout the district.

¶ 12. The engineer first submitted a plat to Racine county in June 2001. He dealt with Anderson from the planning commission, the same person with whom AKG met about the concept map described above. On December 21, 2001, the engineer and a member of AKG met with her about the plat. Because the plat depicted access for Lot 33 onto Highway 31, Anderson instructed them to apply for a Wis. Admin. Code ch. TRANS 233

permit "to access the highway with one private residential driveway." County approval was conditional upon the DOT's approval.

¶ 13.    We do not know what this first proposed plat looked like, but we assume the location of Lot 33 did not change significantly from this initial plat to later versions.[4] We note that later-dated plats in the record, including one dated January 24, 2002, and one dated August 23, 2002, labeled "final plat," both depict a Lot 33 sitting toward the end of the easement path serving the Homestead. It lies on the north side of the easement path and is separated from Highway 31 by a sliver of land that comprises part of the property deeded in 1995 to the State of Wisconsin.[5] We also know that the DOT eventually did approve a thirty-foot right-of-way for Lot 33 to use the easement for access onto the highway.[6]

¶ 14.    The record reveals that AKG had at least two other plats dated 2002 in addition to the January and August plats just mentioned. Given that the first and the final 2002 plats are the same in all respects relevant to these appeals, we will refer to these maps collectively as "the 2002 plat."

¶ 15.    The 2002 plat depicts the following plans for AKG's "Quarry Springs" subdivision. It shows the cur-

[4] It is not clear whether the four homes described in the concept map AKG submitted to Anderson and Clement survived in this preliminary plat, but given that they do not appear in later maps, we know that this aspect of the concept map did not ultimately survive.

[5] In 1995, Edward and Vincent conveyed a small portion of the Vacant Land abutting Highway 31, including the end of the easement path, to the State of Wisconsin, Department of Transportation.

[6] The record reveals that AKG received the DOT's approval by October 2002 but does not pinpoint a date.

517

rent Louis Drive as Cobblestone Drive. The Kostermans' easement path has been altered significantly. The subdivision plans do away with the portion of it that abuts the Homestead. Instead, they provide the Homestead access to Highway 31 via a cul-de-sac that begins at the northwest corner of the Homestead parcel and lies over the part of the easement path abutting it. The plat shows a triangular outlot between the cul-de-sac and Lot 24 (Kostermans' prospective neighbor to the north) marked, "TO BE ATTACHED TO ADJACENT LOT OWNER TO THE SOUTH," i.e., the Homestead. AKG's engineer confirmed that this outlot represents a parcel AKG plans to dedicate to the Kostermans for necessary frontage on the cul-de-sac. The cul-de-sac services an arc-shaped road called Louis Court,[7] which leads out to meet Cobblestone Drive. Access to Highway 31 requires a left-hand turn onto Cobblestone Drive.

¶ 16. Only a remnant of the easement path survives: that part servicing Lot 33, discussed above. The plat refers to a thirty-foot and a sixty-six-foot easement along a dotted-lined path, corresponding to the decades-old 1960 and 1961 easements, respectively, and marks each "TO BE VACATED." The plat makes no mention of the thirty-foot easement the Chviliceks reserved in their 1998 deed.

¶ 17. AKG met with the town of Caledonia on January 29, 2002, to discuss approval of the 2002 plat for Quarry Springs. The town made clear at that meeting that its approval was conditional upon AKG obtaining a letter from the Homestead owners voluntarily releasing their easement. In negotiating approval with the town, AKG represented that the Kostermans

---

[7] The final version changes the name to Stoney Creek Court.

would voluntarily terminate their easement and that the easement would no longer be necessary because of new access to Highway 31 via the cul-de-sac.

¶ 18.  AKG was wrong about the Kostermans' anticipated acquiescence. The Kostermans did not like the proposal AKG showed them. The proposal did not contemplate making the easement path a public road, which is what the Kostermans believe they paid for when they bought the Homestead. After a few conversations between the parties, the Kostermans indicated they were not willing to negotiate further.

¶ 19.  The record indicates several reasons the Kostermans cited for why they disapproved of the proposed Quarry Springs plat. First, the Kostermans would have to reconfigure their driveway. Currently, the driveway on the Homestead property connects the easement path and the Kostermans' garage via a straight path. The garage and driveway are located on the east side of the house, which faces north. As the description above indicates, the AKG proposal contemplates access to the cul-de-sac, via a triangular outlot that is not currently part of the property, at a point to the west of where the current driveway comes out.

¶ 20.  Moreover, because the house on the Homestead faces north, the Kostermans wanted any neighboring properties to face south and lie in a straight row. They believed new houses would have to follow that arrangement if the easement path was their access route to Highway 31. The cul-de-sac, on the other hand, would have created a ring of small lots, with the Kosterman home behind that ring and looking at the side and rear of the new houses at an odd angle and facing their access road at a forty-five-degree angle.

¶ 21.  This particular objection regarding the arrangement of the neighboring homes appears to be

partially monetary and partially aesthetic. With respect to their monetary concerns, the Kostermans opined that the value of their property would be impaired by the proposed orientation of AKG's improvements. As far as aesthetics, Susan expressed that when the couple bought the Homestead, she understood the easement path to provide a buffer protecting it from eventually having neighbors because: (1) The eastern half of the Homestead was designated as an environmental corridor, and the Kostermans would own it; (2) wetlands lie just to the west of the property, so a house would be too close to the road.

¶ 22. Other objections included the fact that the Kostermans would have to connect to a sanitary sewer laid by AKG in the event the subdivision plat were to receive final approval, the inconvenience of a curved road as opposed to the straight shot of the easement path, and Patrick's desire to keep his address.

¶ 23. By October 2002, AKG had received approval of the final plat from the Racine county planning and development commission and the town of Caledonia; it also received the DOT's approval. Its engineer spoke with an employee of the DOT in early October about whether the DOT would approve a revision of the plat to make the easement path a public access way. The employee told him it would reject a plat so revised. The engineer informed AKG about this contact.

¶ 24. Having failed to reach agreement with the Kostermans, AKG filed a complaint for declaratory relief on October 17, 2002, which it amended on May 12, 2003. The complaint sought a declaration that AKG had a right to terminate the Kostermans' private road easement upon providing public road access. Referencing the easement in the 1998 deeds from the White trust and the Chviliceks, AKG alleged that the ease-

ment was to be effective until public road access became available to the Homestead. In the alternative, it alleged that in the event the court construed the deed to require public access over the easement path, the court should reform the deed, because access limitations precluded AKG from obtaining approval for construction of a public road over the easement path.

¶ 25. The Kostermans answered and affirmatively defended that the condition subsequent in the 1998 deeds required public access on the path of the easement as a condition of termination, and such condition had not yet been fulfilled. They also asserted, among other affirmative defenses, that (1) the easement path was also protected by the ancient 1960 and 1961 easements and (2) to terminate the easements "would work an overly burdensome hardship on Defendants due to the location and orientation of the present improvements on the Defendants' property, and is thus barred by equity."

¶ 26. The Kostermans also brought a counterclaim. First, they sought a declaration that the ancient 1960 and 1961 easements remain in full force and effect and cannot be terminated except by an affirmative act on the part of the Kostermans. Second, they alleged that the diminution in the Homestead's property value required compensation in the event the court did allow for termination.

¶ 27. AKG answered the Kostermans' counterclaim, attesting that the ancient easements were no longer in effect and reincorporating all allegations it made in its complaint. As an affirmative defense, it claimed that the easement the 1998 deeds reserved superceded and merged with all prior easements.

¶ 28. In early June, AKG made some adjustments to its development plans in response to the litigation.

521

First, it withdrew the approved 2002 plat and substituted a new plan that would allow AKG to proceed with the Quarry Springs development in phases. The multiple-phase development temporarily suspended development of the southern portion of the Vacant Land, so as not to impact the Homestead and the easement path.

¶ 29. Second, AKG made another attempt to ascertain whether the DOT would be amenable to allowing public road access on the roadway encompassing the relevant easement as part of the Quarry Springs development. On June 10, 2003, the engineer and a member of AKG met with the DOT's Access Management Coordinator, whose responsibilities included the interpretation and enforcement of WIS. ADMIN. CODE ch. TRANS 233 and approval or disapproval of access to state public highways. She made clear at that meeting that the DOT would not permit an expansion of the thirty-foot easement approved for Lot 33.

¶ 30. On June 30, the Kostermans moved for summary judgment. They requested the circuit court to declare that the easement the 1998[8] deeds reserved remains in effect until the easement path becomes a public road and that the 1961 easement remains effective and not subject to any sort of qualification. The circuit court held a hearing on the motion on July 31, 2003.

¶ 31. At the hearing, the circuit court made a definitive ruling that the 1998[9] easement would terminate upon AKG providing a public road for access. It

    [8] Throughout these proceedings, the Kostermans use 1997 when they refer to the 1998 real estate transaction and deeds.

    [9] The circuit court, like the Kostermans, refers to 1997 rather than 1998.

rejected the Kostermans' contention that "upon the following described easement of right of way," the language of the condition for termination, required the easement to become a public road. "I think the condition or argument that somehow the road has to be built on the easement leads to an absurd situation; and, quite frankly, I'm comfortable saying that if there is access to the parcel—that particular easement, the '97 easement would be extinguished."

¶ 32. The circuit court did not rule definitively at the hearing with respect to the 1961 easement. It did, as a preliminary assessment, state that it saw no reason why that easement should terminate. The circuit court rejected AKG's merger argument.[10] It also disagreed with AKG's assertion that the easement should terminate because the DOT's access limitations frustrated the easement's essential purpose. AKG had contended that the sole purpose of the easement was to one day become a public right-of-way, a purpose frustrated by the access limitations. The circuit court found that the purpose was simply ingress and egress, however, and that the easement path could serve this purpose regardless of whether it became public or remained private access. As to AKG's assertion that the DOT would not allow access, it noted that there was nothing showing for certain what the DOT would or would not do.

¶ 33. The circuit court's decision, filed on October 17, 2003, granted relief to the Kostermans with respect to the 1961 easement. Upon denying AKG's motion for reconsideration, which objected that the decision nei-

---

[10] It also expressed concern about a second type of merger argument that AKG advanced, namely, that the Chviliceks' ownership of both the Homestead and the Vacant Land in fee terminated the easement, because the Chviliceks had only half ownership in the latter as tenants in common with the Whites.

ther addressed AKG's affirmative defense of impossibility of performance/frustration of purpose nor reflected the court's favorable ruling with respect to the 1998 easement, the court filed a final judgment, incorporating its prior judgments as to both easements. Both parties appeal.

¶ 34. Summary judgment is proper when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315, 401 N.W.2d 816 (1987). We review summary judgment decisions de novo, using the same methodology the circuit court employs. *Id.* at 315–17. That methodology is well known, and we need not repeat it here. *See, e.g., Lambrecht v. Estate of Kaczmarczyk*, 2001 WI 25, ¶¶ 20–24, 241 Wis. 2d 804, 623 N.W.2d 751.

¶ 35. We first address the later deed. The Kostermans submit that the deed is unambiguous, renewing their contention below that the "upon" clause in the following language necessarily modifies "public road" and not "private road easement," as AKG contends:

> Reserving therefrom a private road easement for the benefit of EDWARD T. CHVILICEK and AUDREY M. CHVILICEK, husband and wife, their heirs and assigns, or subsequent owners of 4213 Highway 31, Racine, Wisconsin 53405, until such time as public road access is made available for said real estate upon the following described easement of right of way, to wit: [legal description of the thirty-foot easement].

Any other interpretation, they assert, is grammatically unsound and renders the clause meaningless.

524

¶ 36. We agree with the Kostermans that the language contained within the four corners of the 1998 deeds is the primary source of what AKG, the Chviliceks, and White intended the condition subsequent to be. *See Rikkers v. Ryan*, 76 Wis. 2d 185, 188, 251 N.W.2d 25 (1977). We further agree that the terms of the 1998 deeds are unambiguous and their construction is therefore purely a question of law. *See id.* We do not, however, agree that the unambiguous terms support the Kostermans' interpretation.

¶ 37. *Rikkers* teaches that the same rules of construction applicable to other instruments apply to interpretation of a deed. *Id.* ("Deeds are construed as are other instruments . . . ." (Citation omitted.)). A cardinal rule of construction is that courts will favor a construction that is reasonable, fair, and practical over one that is unreasonable. *See Niske v. Nackman*, 273 Wis. 69, 75, 76 N.W.2d 591 (1956); 17A Am. Jur. 2d *Contracts* § 338 (2004). However grammatically palatable the Kostermans' proposed construction may be, it is substantively preposterous. It contemplates that a right-of-way over the Vacant Land will exist into perpetuity, until the easement path becomes a public road. It does not by its terms terminate even if Highway 31 someday ceases to be a road. Such an interpretation would require AKG to continue to allow the Kostermans to drive over its land, even if they could not go anywhere, an absurd result.

¶ 38. The interpretation AKG advances does not suffer from the same flaw. Moreover, it does not, as the Kostermans assert, read the "upon" clause out of the deed. Rather, it construes the clause to describe the location of the easement. One could reasonably expect the parties to include a term about where to place the easement.

¶ 39. We hold AKG was entitled to judgment as a matter of law. Once it provides public access, the condition subsequent will have been fulfilled. The easement will terminate by its own express terms.

¶ 40. We further hold that, as a matter of law, the doctrine of changed conditions operates to extinguish both easements as soon as public road access becomes available to the Homestead. According to *Millen*, 201 Wis. 2d at 679, which lists several circumstances under which an easement may come to an end, "an easement may be terminated by the completion or cessation of the particular purpose for which it was granted." A commentator fleshes out this changed conditions doctrine in more detail. *See* Michael J.D. Sweeney, *The Changing Role of Private Land Restrictions: Reforming Servitude Law*, 64 FORDHAM L. REV. 661 (1995). The doctrine allows the courts to intervene to terminate or modify a servitude when circumstances—the existence of which were an underlying assumption of the parties who created the servitude—change in such a way that the contemplated benefit of the servitude is rendered obsolete or substantially unachievable. *See id.* at 689. It allows courts to achieve the result the parties would have intended had they considered the possibility of such changes.

¶ 41. This case exemplifies when changed circumstances demand our intervention. We will first examine the contemplated benefit of the easements. Next, we will ascertain the underlying assumptions of the parties to the deeds by looking to what they knew at the time they created the servitudes. Finally, we shall address what circumstances have changed and how they affect the easements' intended benefit.

¶ 42. The contemplated benefit of both easements was the ability of the Homestead owners to get to a public road in order to come and go where they needed. The language in the 1961 deed reveals, as the circuit court determined and as the Kostermans themselves argued below, that the Chviliceks received from Edward's parents a right-of-way for ingress and egress. Ingress and egress by its very nature contemplates going to and returning from some *place*. It would be incredible to suppose that the Chviliceks and their *parents* would have memorialized in a *deed* an invitation to merely come onto the property. The Kostermans cite several other benefits they would lose if they lost the easement. However, nothing in the record reveals that the Chviliceks and their parents contemplated any of these, namely: (1) the convenience of using a straight path over the Vacant Land; (2) not having to change the Homestead's address; (3) preserving property value; (4) protecting against having next-door neighbors; or (5) shielding the Homestead from unsightly improvements on the neighboring property. We cannot protect ex post valuations of the servitude's utility, because they are irrelevant to the original parties' intent.

¶ 43. Similarly, nothing in the more recent deeds between AKG and the cotenants of the Vacant Land reveals that any of those parties contemplated any of these purposes the Kostermans mentioned. That fact, coupled with the fact that the 1998 easement follows the same path as the ancient one, suggests that the parties did not contemplate any new purpose. We conclude that the later deed also intended to provide the benefit of access to a public road—for the purpose of going to and coming from someplace other than the dominant tenement.

¶ 44. Two major assumptions surrounded both the early and the later transactions. First, the facts clearly reveal that the parties thought an easement would be necessary. The Homestead property is landlocked. Land surrounds it on four sides; there is no evidence that in either transaction the Chviliceks engaged or planned to negotiate with anyone else for an easement or that any land abutting their property would be converted to a public road in the foreseeable future.

¶ 45. The parties also contemplated that the path they chose for the easement could someday be suitable for a public road. Edward testified at his deposition that although no one in his family had ever made plans to dedicate the roadway, his parents made the 1961 easement path sixty-six feet so that this purpose could be accomplished if desired. Sixty-six feet is the regulation width for a public way. It is common knowledge that the average homeowner does not have a driveway sixty-six feet wide. The record supports a similar inference that the parties to the 1998 deeds believed public road access would be possible. We know AKG intended to put in a subdivision before it even bought the Vacant Land. It was entirely foreseeable that roads would be necessary, and there were only two possibilities for connection to Highway 31: Louis Drive and the easement path. Nothing in the record suggests that it favored the latter at the time of purchase. Indeed, the first concept map AKG showed the two employees on the county planning commission contemplated using the easement path as a public way.

¶ 46. Circumstances have changed such that neither of these underlying assumptions remains valid. First, there is no longer any danger that the Homestead property will remain perpetually landlocked without

the private easement. AKG's proposal contemplates public access via the cul-de-sac from the Kostermans' own parcel. Indeed, it intends to dedicate the small triangular outlot to the Kostermans to make that access possible. The ingress and egress benefit that the parties contemplated derived much of its original value from the fact that ingress and egress were necessary. That benefit has been severely discounted.

¶ 47. Moreover, the easement roadway is no longer suitable to become a public road. Since the creation of both deeds, WIS. ADMIN. CODE ch. 233 has gone into effect. It limits access points, wherever practicable, to a minimum distance of 1000 feet apart. WIS. ADMIN. CODE § TRANS 233.06(2). We disagree with the Kostermans' assertion that because AKG never formally submitted the 2002 plat to the DOT for approval, there is a genuine question of material fact as to whether or not the DOT would approve it. The evidence does not support an inference that approval would be a realistic possibility. *See Belich v. Szymaszek*, 224 Wis. 2d 419, 425, 592 N.W.2d 254 (Ct. App. 1999) (competing inferences must be reasonable to create a genuine issue of material fact).

¶ 48. First, we see nothing in the record indicating why AKG's proposal to have a public road only on Louis Drive would be impracticable. Thus, we see no reason why WIS. ADMIN. CODE § TRANS 233.06(2) would not, by its express terms, prohibit a public road lying not only 500 feet or less away from Louis Drive but also a significantly *shorter* distance from Valley Road to the south. "To the extent practicable, the department *shall* require a distance of at least 1000 feet between connections with a state trunk highway or connecting highway." Section TRANS 233.06(2) (emphasis added). Second, whether or not the DOT would allow for a variance

is purely speculative; we will not attempt to predict what it will do. Third, even if we were to so speculate, the engineer's testimony supports only the inference that a variance of 400 feet from the statutory minimum —i.e., 600 feet between connections—would generally be acceptable. Again, the record reflects that Louis Drive and the easement path are 500 feet apart *at most* and Valley Road is closer still to the latter. That the DOT would allow a greater variance to either side has no factual basis. It makes no difference whether § TRANS 233.03(2) has been suspended. Whoever reviews these plats is bound by the same regulations.

¶ 49. Finally, at every stage of the planning process for Quarry Springs, the various state and local governments represented to AKG that public road access at that site would not be possible. The county workers warned them when they submitted the first concept map that the DOT would not allow a road at the easement site. It is unreasonable to assume that the principals of AKG would have abandoned lightly a design, as exemplified in the first concept map, that contemplated building a home for each of the AKG principals. Moreover, a DOT employee told the engineer in October 2002 that the DOT would not approve a revised plan contemplating a public road along the easement drive. Finally, the access management coordinator in charge of interpreting and enforcing Wis. Admin. Code ch. TRANS 233 stated the DOT would not approve making the easement a public way or expanding the thirty-foot right-of-way designated for Lot 33. We will not obligate AKG to engage in futile charades in order to prove the impossibility of public access in light of Wis. Admin. Code § TRANS 233.06.

¶ 50. The effects of Wis. Admin. Code ch. TRANS 233 and the availability of alternative access matter. As

we have said above, all the Chviliceks wanted to do was to ensure ingress and egress to their property to access a public road. They would not have needed to keep the option open to have this public access closer to their house if they knew a public road—which they would not have to keep graveled and maintained themselves—was already going to be available at no cost to them. In the absence of evidence to the contrary, we cannot assume that the Chvilicek couples would have acted differently from what ordinary people would have done had they anticipated this change in circumstances. *See* Glen O. Robinson, *Explaining Contingent Rights: The Puzzle of "Obsolete" Covenants*, 91 Colum L. Rev. 546, 550–51 (1991) (characterizing the doctrine as similar to a default rule that aims to give effect to the parties' intent as objectively determinable).

¶ 51.  We emphasize that this court does not lightly override privately ordered decisions; this case represents the exception, not the rule. Wisconsin's public policy favors the free and unencumbered use of property. *See, e.g., Crowley v. Knapp*, 94 Wis. 2d 421, 434, 288 N.W.2d 815 (1980). In the majority of cases, the free market will adequately allocate land to its most desirable uses. Allowing parties to "hold out" until they derive substantial benefit from their preferred land usage simply helps to establish market value of competing land uses.

¶ 52.  In this case, however, the miniscule benefits the Kostermans derive impose aggregate costs far in excess of the sum total of benefits to all concerned parties. Quarry Springs would greatly benefit the community by providing a new residential area. Yet, the Kostermans insist upon preserving an obsolete servitude in order to halt that development. By their own

531

testimony, they intended not to have neighbors when they bought the Homestead. If they have to have neighbors, they want to ensure that the new development conforms to their design. They want straight roads, not curvy ones that they face at an odd forty-five degree angle. They also object to a cock-eyed view of neighboring houses. They want a straight row of houses, and the houses must face south—toward them. The privilege of dictating how to arrange improvements on AKG's property was not among the benefits the Kostermans paid for when they bought the Homestead and its accompanying easements. They are playing the holdout game but not to preserve any substantial benefit.

¶ 53. We cannot countenance this grossly inefficient allocation of resources. We agree with the Kostermans that they derive a substantial benefit from the easement that deserves protection. It affords ingress and egress to their otherwise landlocked property. We simply do not agree that this benefit lasts past the point of receiving public road access at their own lot line. For that reason, we choose to modify the easements rather than simply terminate them.[11] They will last until AKG provides them with public road access.

¶ 54. Lastly, we note our holding and rationale are consistent with the latest RESTATEMENT OF PROPERTY LAW. RESTATEMENT (THIRD) OF PROP.: SERVITUDES § 7.10 (2000) also adopts the doctrine of changed conditions, reasoning in comment a. as follows:

---

[11] With respect to the 1998 easement, we put aside for the purposes of our changed conditions analysis our holding above that the easement will terminate by its own terms upon the Homestead receiving public road access.

> The potentially unlimited duration of servitudes creates substantial risks that, absent mechanisms for nonconsensual modification and termination, obsolete servitudes will interfere with desirable uses of land.
>
> . . . .
>
> The changed-conditions rule has traditionally been used to terminate servitudes, rather than to modify them, but the less drastic step should be taken if modification would permit the servitude to continue to serve the purpose for which it was designed to an extent that is worthwhile . . . .
>
> The changed-conditions doctrine may be grounded in implied intent of the parties and public policy . . . . The argument from public policy is that permitting the enforcement of servitudes after they have lost their utility reduces land values and turns the law into an instrument of extortion. Unless modification or termination is permitted, the servitude beneficiary can exact an unreasonably high price for release of an encumbrance that otherwise has no value and interferes with the ability of the servient owner to use his or her property.

This comment nicely summarizes our position in this case.

¶ 55. We affirm the circuit court's grant of declaratory relief for AKG. The 1998 easement terminates upon AKG providing the Homestead with public road access, by its own force or, alternatively, based on the doctrine of changed conditions. In addition, we reverse the circuit court's judgment to the extent that it preserves the 1961 easement into perpetuity without condition. We modify that easement to extinguish when the Kostermans receive access to Highway 31 via the cul-de-sac and Louis Drive. To do otherwise would unrea-

sonably restrict the construction of a beneficial development, at great cost and without countervailing benefit.

*By the Court.*—Judgment affirmed in part and reversed in part.