2003 SD 62

William BURKHART, Pat Peters, Marjo Peters, Colleen Moran, Annette Fisher, Steve Glover, Carla Glover, Iwalana Gali, John Aye and Trenda Aye, Plaintiffs and Appellants,

v.

Arlendo "Casey" LILLEHAUG and Lotus D. Lillehaug, Defendants and Appellees.

No. 22252.

Supreme Court of South Dakota.

Argued Oct. 9, 2002.

Decided May 28, 2003.

Brad P. Gordon and Roger A. Tellinghuisen of Fuller, Tellinghuisen, Gordon & Percy, Spearfish, South Dakota, Attorneys for plaintiffs and appellants.

Dwight A. Gubbrud of Bennett, Main & Gubbrud, Belle Fourche, South Dakota, Attorneys for defendants and appellees.

TICE, Circuit Judge.

[¶ 1.] William Burkhart, Pat Peters, Marjo Peters, Colleen Moran, Annette Fisher, Steve Glover, Carla Glover, Iwalana Gali, John Aye and Trenda Aye (hereinafter collectively referred to as Burkhart) brought suit against Arlendo "Casey" Lillehaug and Lotus D. Lillehaug (Lillehaugs) seeking a mandatory injunction to compel Lillehaugs to reconstruct a road providing access to Burkhart's property alleging that Lillehaugs unreasonably altered the road from its original condition. The trial court determined the road had not been unreasonably altered and denied Burkhart's requested relief. We affirm.

## FACTS AND PROCEDURE

[¶ 2.] In 1963, the late John Aye II purchased a parcel of unimproved land located on a hillside in Spearfish Canyon in an area historically known as Savoy in Lawrence County, South Dakota. The land was plated by Aye in 1965 and designated as lots 1 through 9. The plat was duly recorded at the Office of the Lawrence County Register of Deeds.

[¶ 3.] Bud Polley, a surveyor, demarcated a road on the subdivision plat as the designated access from the county highway to the newly created lots. The road was depicted on the plat by a double line marked "road." The plat contained no specific survey information or dimensions that would enable it to be precisely located. There was no indication of its length, width, slope, distance, direction, grade or radius. The plat also did not contain any words of dedication.

[¶ 4.] Aye bulldozed a road or trail through lot 5 to the other lots around the time this plat was being prepared. The road built by Aye was a "cat trail" which provided limited, seasonable access to two-wheel drive vehicles.

[¶ 5.] In March 1977 Lillehaugs purchased lot 5 from Tom Hegen. None of the lots were improved or occupied at this time. In the summer of 1978 Lillehaug moved a garage on to lot 5. The structure was destroyed by a fire in 1981. At this time, Lillehaug hired a contractor, Bud Stafford, to re-shape the road as it crossed lot 5. The result of the modification to the road was a steeper curve with a wider radius. Over the next seven years, Lillehaugs improved their property by building a new house and garage. They eventually moved into their home in 1989.

[¶ 6.] In 1992 William Burkhart purchased lots 8 and 9 from Dr. Aspaas. At that time, the road or trail crossing lot 5 provided the only means of access to lots 8

and 9. Prior to this purchase Burkhart was aware that the road had been changed by the Lillehaugs ten years earlier. Burkhart began construction of a home on lots 8 and 9 in 1995. Until this point, no one had used the trail beyond lot 5 except occasionally during the summer months.

[¶ 7.] Concerning the additional appellants: Pat and Marjo Peters purchased lot 9 in 1993; Iwalana Gali, the surviving spouse of the late John Aye II, conveyed lots 2, 3 and 4 to her children in December 1993; and, in 1996 Iwalana conveyed lot 1 to the Iwalana Gali Trust.

[¶ 8.] In December 1999 Burkhart filed suit in the Fourth Judicial Circuit Court seeking a mandatory injunction compelling Lillehaugs to restore the road crossing lot 5 as it was prior to the change in 1978.

## STANDARD OF REVIEW

[¶ 9.] Our standard of review is well settled, "We will not set aside a trial court's findings of fact unless they are clearly erroneous. A trial court's finding is clearly erroneous if, after reviewing the entire evidence, we are left with the definite and firm conviction that a mistake has been made." *In re Dokken*, 2000 SD 9, ¶ 10, 604 N.W.2d 487, 490–91. We review a trial court's conclusions of law under the de novo standard, giving no deference to the trial court's conclusions of law. *Osloond v. Osloond*, 2000 SD 46, ¶ 6, 609 N.W.2d 118, 121. A mixed question of law and fact is treated in the same manner as a question of law and such questions are of the type which are freely reviewable by the court without deference to the lower court. *Matter of Groseth Intern., Inc.*, 442 N.W.2d 229, 232 (S.D.1989).

## ANALYSIS AND DECISION

### ISSUE

[¶ 10.] **Whether the modification of the easement by the servient-estate own-**

er (Lillehaugs) without specific concurrence by the dominant-estate owner (Burkhart) was reasonable.

[¶ 11.] In its findings of fact and conclusions of law and the incorporated memorandum opinion, the trial court determined that Lillehaugs, as the owners of the servient tenement, were entitled to make *reasonable changes* to the servient estate so long as they did not unreasonably interfere with the dominant tenement owners' use of the easement. *See* 25 Am.Jur. (2d) *Easements & Licenses* § 76 (2002). The Restatement (Third) Property (Servitudes) § 4.8 (2000) provides:

Except where the location and dimensions are determined by instrument or circumstances surrounding creation of a servitude, they are determined as follows:

(3) *Unless expressly denied by the terms of an easement,* as defined in § 1.2, the owner of the servient estate is entitled to make *reasonable changes* in the location or dimensions of an easement, at the servient owner's expense, to permit normal use or development of the servient estate, but only if the changes do not (a) significantly lessen the utility of the easement;

(b) increase the burdens on the owner of the easement in its use and enjoyment; or

(c) frustrate the purpose for which the easement was created.

[¶ 12.] The trial court determined, after considering all of the evidence presented and viewing the property, it was not shown by the greater weight of the evidence that the changes to the road in 1982 were an unreasonable alteration. In so holding, the trial court determined that the changes did not lessen the utility of the easement, increase the burden on the Burkhart's use and enjoyment of the ease-

ment, or frustrate the purpose for which the easement was created. In fact, the trial court determined that the existing roadway provided access substantially similar to what the road did in its original configuration. In this regard, finding of fact 18 stated:

The original road was approximately 9 feet wide. The radius of the curve prior to the change in 1982 was such that larger vehicles could not have made the turn to access the plaintiff's property. *Both the present road and the original road allowed seasonal access with a two-wheel drive vehicle and year-round access by a four-wheel drive vehicle*

[¶ 13.] Additionally, the trial court found the changes made in the road in 1982 were *beneficial* to Burkharts. For example, finding of fact 19 states: "It is unlikely that the cement trucks and log-hauling vehicles involved in the construction of the Burkhart home could have reached lots 8 and 9 on the old, narrower "switchback" road."

[¶ 14.] The trial court also determined the current finished road, though containing an increased incline, is wider than the "cat-trail" and lessens the sharp turn in the road that previously existed. This finding is supported by the testimony of both parties' expert witnesses. When asked about the condition of the road prior to 1982 Burkhart's expert testified:

[B]ecause the degree of the curvature was such that you would almost have to come to a stop to make the curve. It was obvious—It was like a switchback is essentially the best way to describe that curve. And to make it up that curve, even with a vehicle, I'm sure they had to get very slow to do the turn.

Lillehaug's expert also opined that it would be difficult for most vehicles to negotiate the old switchback turn.

Q: Have you had an opportunity to measure the radius of the road depicted on Exhibit 3?

A: Yes, I have.

Q: Do you believe there would be any problems with a vehicle negotiating the turn shown on lot 5?

A: Um, by the standards, even a large pickup would have a hard time negotiating this corner that's depicted on lot 5.

Q: Could you explain to the Court what standards you're referring to?

A: These are out of the International Traffic Institute. They have some turning radiuses [sic] established. Basically for a single-axle-truck, it's 42–and–a–half feet. I believe for a car it's 21 feet. This one at the outside—you measure it at the outside of the corner—is right at 21 feet. So it would be hard for a car or anything larger that a car or a delivery van.

[¶ 15.] The trial court's findings of fact are supported by the testimony of the witnesses and provide sufficient grounds for this Court to affirm the decision below. Additionally, common sense supports this same conclusion. The history of this road when it originally came into existence specifically demonstrates that it was more pragmatic than anything else. It was not surveyed, platted with specificity or otherwise clearly established. When it was first used it is apparent there was no vision toward long term development. It was built to address immediate necessity, not future development. The plat itself is ample evidence of this fact. The road, as indicated, was simply a drawing irrespective of topography. In fact, its course as suggested in the original plat would not have even been possible. Therefore, as development progressed the road moved from a mere concept to a simple "cat trail" and then eventually required alteration to create a more functional road. That progression was reasonable in this situation.

[¶ 16.] Therefore, we affirm the trial court's decision that the changes were not unreasonable in nature. Given this disposition of issue one review of the remaining issues is unnecessary.

[¶ 17.] Affirmed.

[¶ 18.] GILBERTSON, Chief Justice, and KONENKAMP and ZINTER, Justices, concur.

[¶ 19.] TICE, Circuit Judge, for AMUNDSON, Retired Justice, disqualified.

[¶ 20.] SABERS, Justice, dissents.

[¶ 21.] MEIERHENRY, Justice, not having been a member of the Court at the time this action was submitted to the Court, did not participate.

SABERS, Justice (dissenting).

[¶ 22.] I dissent because the alteration of this road by the servient landowner was contrary to the plat, self-serving, and unreasonable to the dominant landowners.

1. The majority opinion makes much of the fact that the plat "contained no specific survey information" ... "of its length, width, slope, distance, direction, grade or radius." Nonsense. I attach a copy of the plat which shows specific survey information of its length, width, distance and direction. All the required information is present because the plat includes a scale of one inch equals one hundred feet ($1'' = 100'$). What more is really needed?

2. Plaintiff contends that the uncontroverted testimony at trial was that the road was physically staked, constructed and located consistent with the plat. Specifically, John Aye II,

the person who originally platted the land, hired Bud Polley, a Lawrence County surveyor to prepare a survey of the land with the intention of subdividing it into lots. Polley prepared a plat and recorded it. At the time he prepared the plat, Polley noted the road on the plat and then Polley and Aye staked the road. After Polley and Aye placed survey pins for the lots, Aye used his bulldozer to carve the road as it was noted on the plat.

3. The platted road extends more than half way into Lot 5, which lot was purchased by Lillehaug with full knowledge of the road's location. Lillehaug reduced the distance the road extends onto his lot from approximately 125′ to approximately 50′. He did this so that he could build his house and his garage where the platted road was located. This was totally self-serving and unreasonable.

4. In moving the platted road to make room for his house and garage, Lillehaug changed the grade of the [platted] road from a reasonable 13 degrees to an unreasonable 32 degrees, all to the detriment of the dominant landowners for whom the road was platted. As civil engineer Neil Stodolski testified,

[w]ell, it is very steep in the curve section than what—certainly than what is considered good road design. [The 32% grade] far exceeds anything that you are going to want to travel with for any type of vehicle. But it is also on a curve and that makes it worse because you have to slow down to traverse the curve ... again, a 32% grade is an exceedingly steep grade. County standard allows for 12%.

5. I would reverse and remand and require Lillehaug to reduce the grade to a maximum of 20 degrees by replacing the road closer to its platted location.

*See* the plat and Plaintiff's exhibit 14 attached hereto.

LOT 5

LOT 5
1.21 ACRES

SCALE 1" = 40'

ESTIMATED GRADE FOR OLD ROAD - 13'?

LOT 5
ORCHARD ACCESS ROAD
LAWRENCE COUNTY, SD
WS 1742

22252