AKG Real Estate, LLC, a limited liability
company, Plaintiff-Appellant-Cross-Respondent,

v.

Patrick J. Kosterman and Susan A. Kosterman,
Defendants-Respondents-Cross-Appellants-
Petitioners.

Supreme Court

No. 2004AP188. *Oral argument November 15, 2005.
—Decided July 14, 2006.*

2006 WI 106

(Also reported in 717 N.W.2d 835.)

1

For the defendants-respondents-cross-appellants-petitioners there were briefs by *Daniel Kelly, J. Bushnell Nielsen* and *Reinhart Boerner Van Deuren S.C.,* Milwaukee, and oral argument by *Daniel Kelly.*

For the plaintiff-appellant-cross-respondent there was a brief by *Robert E. Hankel* and *Hankel, Bjelajac,*

*Kallenbach, Lehner & Koenen, L.L.C.,* Racine, and oral argument by *Robert E. Hankel.*

An amicus curiae brief was filed by *M. Elizabeth Winters, Daniel W. Hildebrand,* and *DeWitt Ross & Stevens, S.C.,* Madison, on behalf of the Village of Merrimac.

¶ 1. DAVID T. PROSSER, J. This case presents the question whether an express easement may be relocated or terminated without the consent of the dominant estate. In a published decision,[1] the court of appeals held that a servient estate could unilaterally terminate an express right-of-way easement once the servient estate provided an alternate route of ingress and egress to the dominant estate. We reverse the court of appeals because we conclude that the owner of a servient estate cannot unilaterally relocate or terminate an express easement.

I

¶ 2. We begin this case about easements by reviewing several key terms. An easement (or servitude) is an interest that encumbers the land of another. *McCormick v. Schubring,* 2003 WI 149, ¶ 8, 267 Wis. 2d 141, 672 N.W.2d 63 (citing *Ludke v. Egan,* 87 Wis. 2d 221, 227, 274 N.W.2d 641 (1979)). It is a liberty, privilege, or advantage in lands, without profit, and existing distinct from the ownership of the land. *Id.; Schwab v. Timmons,* 224 Wis. 2d 27, 35–36, 589 N.W.2d 1 (1999); *Stoesser v. Shore Drive P'ship,* 172 Wis. 2d 660, 667, 494 N.W.2d 204 (1993).

---

[1] *AKG Real Estate, LLC v. Kosterman,* 2004 WI App 232, 277 Wis. 2d 509, 691 N.W.2d 711.

¶ 3. An easement creates two distinct property interests—the dominant estate, which enjoys the privileges as to other land granted by an easement, and the servient estate, which permits the exercise of those privileges. *Schwab,* 224 Wis. 2d at 36.

¶ 4. In the spring of 2000, Patrick and Susan Kosterman (the Kostermans) purchased a house on a four-acre lot from Edward and Audrey Chvilicek (the Chviliceks). The Kostermans' property (the Dominant Estate) lacked access to a public road except by means of three recorded, physically overlapping easements across part of an 80–acre parcel of land (the Servient Estate), which partially surrounded their property.

¶ 5. Nearly 50 years ago the Dominant Estate and the Servient Estate were under common ownership. Some time prior to 1960, Louis and Angeline Chvilicek bought approximately 84 acres of vacant land along Highway 31 in Racine County. In August of 1960 Louis and Angeline deeded the four-acre Dominant Estate to their son and daughter-in-law, the Chviliceks, and granted the Dominant Estate a 30–foot-wide easement over the 80–acre Servient Estate, because the Dominant Estate lacked access to a public road.

¶ 6. In 1961 Louis and Angeline granted the Chviliceks a second right-of-way easement along the same course as the 1960 easement. This second easement was 66 feet wide. By increasing the width of the easement, Louis and Angeline made it possible for the easement to be converted into a public road.

¶ 7. When Louis Chvilicek died, Angeline conveyed to the Chviliceks, as tenants-in-common, a 50 percent interest in the Servient Estate. Angeline conveyed the other 50 percent interest in the property to her daughter and son-in-law, Joyce and Vincent White.

When Joyce and Vincent died, their interest in the Servient Estate transferred into the Vincent J. White Trust (the Trust).

¶ 8. In 1997 AKG Real Estate, LLC (AKG) offered to purchase the Servient Estate from the Chviliceks and the Trust, with the intention of developing a subdivision. AKG purchased the entire Servient Estate from the Chviliceks and the Trust in January 1998 by warranty deed and trustee's deed. The 1998 deeds expressly recognized a 30–foot-wide private road easement on the same location as the 1960 and 1961 easements:

> Reserving therefrom a private road easement for the benefit of Edward T. Chvilicek and Audrey M. Chvilicek, husband and wife, their heirs and assigns, or subsequent owners . . . until such time as public road access is made available for said real estate upon the following described easement of right of way . . . .

In addition, the two deeds reserved to the grantors (including the Chviliceks) all "recorded and/or existing easements and right of way reservations[.]"

¶ 9. While AKG was planning to develop the land, the Chviliceks sold the Dominant Estate to the Kostermans in 2000. Initially, AKG's development plan depicted two public roads connecting with Highway 31 from the planned subdivision. The first was along the path of the Kostermans' easements and the second, to the north, was at what is presently Cobblestone Drive.[2] After meeting with Racine County officials, however, AKG realized that the Wisconsin Department of Transportation (DOT) was unlikely to approve a public road

---

[2] On the initial subdivision plats, Cobblestone Drive was labeled Louis Drive. We will refer to the road as Cobblestone Drive.

along the Kostermans' easements because Wis. Admin. Code § Trans 233.06 (Jan., 2004)[3] requires a minimum distance of 1000 feet between roads that connect to state highways. If a public road affording access to Highway 31 were constructed over the Kostermans' easements, the road would have been within 600 feet of Valley Road to the south, and within 300 feet of Cobblestone Drive to the north.

¶ 10. After determining DOT would not consent to a public road located along the Kostermans' easements, AKG altered its subdivision plans and proposed to give the Kostermans access to Highway 31 via a cul-de-sac, which would connect with Cobblestone Drive, which in turn would connect with Highway 31. Under this plan, AKG would develop about seven lots over the Kostermans' easements and the Kostermans would be required to reconfigure their driveway so that it connected with AKG's proposed cul-de-sac. Before AKG could get the necessary governmental approval for its subdivision plat, however, the Kostermans needed to release their easement rights to AKG, or agree to move the location of the easements. To date, the Kostermans have refused to modify their right-of-way easements to accommodate AKG's development plans.

¶ 11. The Kostermans objected to relocating the easements for several reasons in addition to requiring them to reconfigure their driveway. AKG's development

---

[3] Wisconsin Admin. Code § Trans 233.06(2) provides:

The department shall determine a minimum allowable distance between connections with the state trunk highway or connecting highway, between any 2 highways within the land division and between a highway within the land division and any existing or planned highway. To the extent practicable, the department shall require a distance of at least 1,000 feet between connections with a state trunk highway or connecting highway.

plan would put the Kostermans' house in an odd position relative to the cul-de-sac and the neighboring houses, require them to change their street address, and replace their direct access to Highway 31 with a circuitous route. Consequently, AKG again modified its plans to develop the subdivision. The modified plan calls for development to occur in two phases, the second of which awaits the denouement of this litigation.

¶ 12. In response to the Kostermans' unwillingness to relocate or terminate their easements, AKG sought a declaratory judgment that the easements terminated once AKG provided alternate public road access to the Dominant Estate. The Kostermans counterclaimed for a declaratory judgment that the 1960 and 1961 easements would remain in effect even if AKG provided an alternate means of ingress and egress to the Dominant Estate. The Kostermans moved for summary judgment. On summary judgment, the Racine County Circuit Court, Charles H. Constantine, Judge, ruled that the 1998 easement would terminate once AKG provided public road access, regardless of the location, but the 1961 easement of 66 feet would remain in effect even after AKG provided the Dominant Estate with alternate public road access. Both parties appealed.

¶ 13. The court of appeals affirmed the circuit court's holding that the 1998 easement terminated once AKG provided public road access, but it reversed the circuit court's holding that the 1961 easement would continue. *Kosterman,* 277 Wis. 2d 509, ¶ 55. First, the court of appeals concluded the 1998 easement was unambiguous and that it terminated once AKG afforded the Dominant Estate public road access regardless of the location. *Kosterman,* 277 Wis. 2d 509, ¶¶ 37–39. Second, the court of appeals held that both

11

the 1961 and the 1998 easements should be modified under the doctrine of changed conditions to avoid a "grossly inefficient allocation of resources." *Id.,* ¶¶ 40, 53. Central to the court of appeals conclusion was its assessment that "the miniscule benefits the Kostermans derive impose aggregate costs far in excess of the sum total of benefits to all concerned parties." *Id.,* ¶ 52. Accordingly, the court of appeals modified the easement created by the 1960 deed as well as the 1961 easement so that both easements would terminate once the Dominant Estate received alternate public road access. *Id.,* ¶ 53. The Kostermans petitioned for review.

II

■

¶ 14. This case comes to us on summary judgment. We review a circuit court's grant or denial of summary judgment independently of the circuit court or court of appeals, applying the same methodology as the circuit court. *O'Neill v. Reemer,* 2003 WI 13, ¶ 8, 259 Wis. 2d 544, 657 N.W.2d 403. Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Wis. Stat. § 802.08(2). Resolution of this case requires interpretation of the documents creating the 1961 and 1998 easements. Here, both the circuit court and the court of appeals decided the 1961 and 1998 easements were unambiguous. *See Kosterman,* 277 Wis. 2d 509, ¶¶ 36, 43. Whether a deed or other instrument is ambiguous is a question of law we review independently. *See Gojmerac v. Mahn,* 2002 WI App 22, ¶ 24, 250 Wis. 2d 1, 640 N.W.2d 178 (Ct. App. 2001). If the language of a deed is unambiguous, its construction is also a question of law. *Rikkers v. Ryan,* 76 Wis. 2d 185, 188, 251 N.W.2d 25 (1977).

12

## III

¶ 15. Two easements are at issue in this case: (1) the 30–foot easement reserved in 1998; and (2) the 66–foot easement created in 1961. Both easements are express easements (easements by written grant or reservation).[4] As the court of appeals recognized, if the 1961 easement remains in effect, it is unnecessary to consider under what conditions the 1998 easement terminates. Because we conclude that the 1961 easement is unambiguous and that it survived the 1998 deeds, we begin and end with the terms of the 1961 easement.

¶ 16. The 1961 conveyance to the Chviliceks created an express easement of right of way. The instrument states Louis and Angeline Chvilicek "[d]o give, grant and convey unto [Edward and Audrey Chvilicek], and to their heirs and assigns forever, an ease of rt of way for purposes of ingress and egress upon the fol desc real est," after which follows a metes and bounds description of the easement.[5]

¶ 17. In attacking the continued vitality of the 1961 easement, AKG makes two distinct arguments. First, AKG argues that changed circumstances frustrate the purpose of the 1961 easement, requiring that the court modify the easement so that it will terminate once AKG provides the Kostermans with alternate ac-

---

[4] In addition to express easements, common types of easements include prescriptive easements, easements by necessity, and easements by implication. *See* Jesse S. Ishikawa, *Wisconsin Law of Easements* § 2.1 (2d ed. 2004) (discussing the ways in which easements are created).

[5] A metes and bounds description defines a parcel by describing the courses and directions of its boundaries, and is most often used when a parcel has an irregular shape. 1 *Property Assessment Manual for Wisconsin Assessors,* ch. 5, at 5–8 (2005).

cess to a public road. Second, AKG argues that when it purchased the Servient Estate in 1998, the 1998 deeds released the 1960 and 1961 easements. We address each argument.

A. Should the 1961 Easement Be Terminated under the Doctrine of Changed Conditions?

¶ 18. AKG urges the court to adopt the changed conditions doctrine set forth in the *Restatement (Third) of Property: Servitudes* § 7.10 (2000). Section 7.10 of the *Restatement* states:

> (1) When a change has taken place since the creation of a servitude that makes it impossible as a practical matter to accomplish the purpose for which the servitude was created, a court may modify the servitude to permit the purpose to be accomplished. If modification is not practicable, or would not be effective, a court may terminate the servitude. Compensation for resulting harm to the beneficiaries may be awarded as a condition of modifying or terminating the servitude.

> (2) If the purpose of a servitude can be accomplished, but because of changed conditions the servient estate is no longer suitable for uses permitted by the servitude, a court may modify the servitude to permit other uses under conditions designed to preserve the benefits of the original servitude.

¶ 19. Subsection (1) reflects the common law rule that an easement for a particular purpose terminates when it becomes impossible to use the easement for the purpose intended in the granting instrument. *Restatement (Third) of Property: Servitudes* § 7.10, at 399 (Reporter's Note) (noting that traditionally courts terminate easements when the purpose becomes impossible to accomplish rather than by resort to the changed condi-

14

tions doctrine); 25 Am. Jur. 2d *Easements and Licenses* § 96 (2004) ("An easement granted for a particular purpose normally terminates as soon as such purpose . . . is rendered impossible of accomplishment.").

¶ 20. In contrast, prior to the *Restatement (Third) of Property: Servitudes,* the rule set forth in subsection (2) was traditionally not used to terminate easements. *Restatement (Third) of Property: Servitudes* § 7.10 cmt. a; Susan F. French, *Toward a Modern Law of Servitudes: Reweaving the Ancient Strands,* 55 S. Cal. L. Rev. 1261, 1269, 1301 (1982) (noting there is nothing comparable to the changed conditions doctrine of equitable covenants in easement law);[6] *see also Cortese v. United States,* 782 F.2d 845, 851 (9th Cir. 1986) (implying that covenants, but not easements, are subject to the doctrine of changed conditions). Subsection (2) permits an easement to be terminated—where changed conditions exist —because the easement has become unreasonably burdensome upon the servient estate, obsolete, or economically wasteful. *See* French, *supra* at 1316.

¶ 21. AKG appears to argue that the 1961 easement should be terminated or modified under both standards, impossibility of purpose and changed circumstances, suggesting that the latter leads to the former. We conclude that the easements should not be modified or terminated under *Restatement (Third) of Property: Servitudes* § 7.10(1) or (2).

1. Should the 1961 Easement Be Terminated Because It Is Impossible to Fulfill Its Purpose?

¶ 22. AKG contends that the purpose of the 1961 easement was to provide ingress and egress until public

---

[6] Professor French was the Reporter for the *Restatement (Third) of Property: Servitudes.*

road access was provided but that subsequent developments have rendered the easement useless for this purpose because DOT regulations make it impossible to construct a public road along the course of the easement. AKG emphasizes two changed conditions. First, in 1995 the Chviliceks deeded a portion of the 66–foot-wide easement to the State of Wisconsin and agreed that a public road could not be placed where the 1961 easement intersected with Highway 31. Second, as of 1999 the DOT assumed increased oversight of compliance with Wis. Admin. Code § Trans 233.06. According to AKG, these two facts make it impossible for the easement to become a public road, defeating the purpose of the easement. Therefore, given the Kostermans' refusal to bargain over relocating the easements, AKG contends it is appropriate for a court to modify the easements.

¶ 23. We disagree with AKG's characterization of the easements. The first step in analyzing impossibility of purpose is to determine the purpose of the easement. Jon W. Bruce & James W. Ely, Jr., *The Law of Easements and Licenses in Land* § 10:8, at 10–15 (2001). Contrary to AKG's assertion, the primary purpose of the 1961 easement is not to become a public road. Rather, the primary purpose of this easement is to provide ingress and egress to the Dominant Estate over a specifically described course. The plain text of the 1961 instrument creates "an ease[ment of right of way] *for purposes of ingress and egress* . . . ." (Emphasis added.) That valid purpose has not been extinguished, frustrated, or otherwise rendered impossible to fulfill.

¶ 24. The court of appeals erred by concluding that the purpose of the easement was to authorize a public road. True, the 1961 easement made it possible

to convert the private road into a public road. But, the 1961 easement did not change the overriding purpose of the easement from providing ingress and egress to providing a public road.

¶ 25. Next, AKG appears to shift ground, arguing that the 1961 easement should be terminated once its purpose—to provide ingress and egress to the Dominant Estate—can be accomplished by an alternative course; that is, once the easement becomes unnecessary it should terminate. AKG's position, however, is contrary to longstanding Wisconsin easement law, which holds that an express easement does *not* terminate even when the necessity or purpose of the easement ceases. *Niedfeldt v. Evans*, 272 Wis. 362, 364, 75 N.W.2d 307 (1956).

¶ 26. In *Niedfeldt* the defendant owned a prescriptive right of way across the plaintiff's land. *Id.* at 363. Once public road access was provided to the defendant's property, the plaintiff constructed a fence across the easement and brought suit for trespass against the defendant, claiming the prescriptive easement terminated once alternate public road access became available. *Id.* at 364. The court rejected the plaintiff's contention that a prescriptive easement terminates when the necessity for the easement ceases. *Id.* at 365.

¶ 27. Central to *Niedfeldt* were the distinctions among easements of necessity, easements for a particular purpose, prescriptive easements, and express easements. *See id.* at 364–65. The circumstances under which an easement can be modified or terminated depend upon the type of easement. "Thus, if an easement is granted for a particular purpose only, the right

17

continues while the dominant tenement is used for that purpose, but ceases when the specified use ceases." *Id.* at 364 (quoting 17 Am. Jur., *Easements* § 137, at 1023). "Moreover, a way of *necessity* is a temporary right in the sense that it continues only so long as the necessity exists." *Id.* (emphasis added).

¶ 28. In contrast, neither a prescriptive easement nor an express easement can be modified or terminated solely because the necessity for the easement ceases. *Id.* at 365. Thus, "[t]he rule that the right ceases with necessity has no application to ways acquired by express grant or by prescription; *a right to a way so created cannot be defeated by showing that the owners have another convenient and accessible way of going to and from their premises." Id.* (quoting 28 C.J.S. *Easements* § 54, at 718) (emphasis added); *Millen v. Thomas,* 201 Wis. 2d 675, 679, 550 N.W.2d 134 (Ct. App. 1996). Thus, even if AKG did provide alternate public road access to the Kostermans, the 1961 easement would remain in force, because an express easement continues regardless of whether the dominant estate needs the easement.

¶ 29. The *Niedfeldt* court acknowledged the rule that an easement can terminate with the cessation of the particular purpose for which the easement is granted, *Niedfeldt,* 262 Wis. 2d at 364, but that is not the case here. In the 40–plus years since the easement was granted, the owners of the Dominant Estate have used the easement for ingress and egress. No circumstances have changed to frustrate this purpose or render it impossible. The Kostermans continue to use the driveway created by the 1960 and 1961 easements, and they are not required to give up this use even if a reasonable alternative becomes available. Another rule,

18

that the right ceases with the necessity, has no application when the right was created not by "necessity" but by express grant. *Id.* at 365. As the court put it, "any offer to prove that the defendant [now] had another road to his farm would not defeat his easement and hence was immaterial." *Id.*

2. Should the Court Modify the Easement Because Changed Conditions Make It Unduly Burdensome upon the Servient Estate?

¶ 30. AKG also requests that, regardless the language of the 1961 instrument, the court adopt *Restatement (Third) of Property: Servitudes* § 7.10(2), and thereby modify the easement because it inhibits the free and unrestricted use of property and unreasonably burdens its property. Alternatively, but in a closely related argument, AKG urges the court to modify the 1961 easement pursuant to *Restatement (Third) of Property: Servitudes* § 4.8(3).[7]

[7] Section 4.8(3) states:

Except where the location and dimensions are determined by the instrument or circumstances surrounding creation of a servitude, they are determined as follows:

. . . .

(3) Unless expressly denied by the terms of an easement, as defined in § 1.2, the owner of the servient estate is entitled to make reasonable changes in the location or dimensions of an easement, at the servient owner's expense, to permit normal use or development of the servient estate, but only if the changes do not

(a) significantly lessen the utility of the easement,

(b) increase the burdens on the owner of the easement in its use and enjoyment, or

(c) frustrate the purpose for which the easement was created.

19

¶ 31. We decline to apply either *Restatement (Third) of Property: Servitudes* §§ 7.10(2) or 4.8(3) to the facts of this case. Even at the risk of sanctioning unneighborly and economically unproductive behavior, this court must safeguard property rights. *See Schwab,* 224 Wis. 2d at 41; *Jacque v. Steenberg Homes, Inc.,* 209 Wis. 2d 605, 631, 563 N.W.2d 154 (1997); *Guse v. Flohr,* 195 Wis. 139, 147, 217 N.W. 730 (1928). Thus, in *Schwab* we refused to impose a right-of-way easement of necessity across land adjoining the petitioners even though doing so effectively rendered the petitioners' land useless because the cost of providing alternative vehicular access was prohibitive. *Schwab,* 224 Wis. 2d at 39–41. In *Jacque* we upheld a $100,000 punitive-damages verdict despite nominal damages of $1 in order to protect property rights, where the defendant intentionally trespassed across the plaintiff's land to avoid the high cost of the alternative route. *Jacque,* 209 Wis. 2d at 631. Similarly, in *Guse* we concluded that the dominant estate could not unilaterally modify a right-of-way easement even though doing so would have been economically beneficial to both the dominant estate and the servient estate. *Guse,* 195 Wis. at 147 ("[T]he refusal of the plaintiff to permit the removal of the fence to a point one rod farther south . . . is unneighborly, spiteful, and unreasonable. However that may be, the legal rights of the plaintiff remain the same. . . . There can be no balancing of equities in this case.").

---

*Restatement (Third) of Property: Servitudes,* § 4.8(3). Compared to *Restatement (Third) of Property: Servitudes,* § 7.10(2), § 4.8(3) arguably represents an even more radical departure from the majority rule because it allows a court to modify an easement without concluding that conditions have changed.

Nothing in the host of cases AKG cites convinces us that we should sacrifice property rights in this case in favor of economic efficiency. As such, the court of appeals erred in placing overriding significance upon the need to prevent economic waste. *Kosterman,* 277 Wis. 2d 509, ¶ 1.

¶ 32. In support of its position, AKG relies upon *M.P.M. Builders, LLC v. Dwyer,* 809 N.E.2d 1053 (Mass. 2004), which concluded that four other jurisdictions had adopted or approved of *Restatement (Third) of Property: Servitudes* § 4.8(3), while only two jurisdictions had expressly rejected it. Examination of *Dwyer* and the cases cited therein demonstrates that only in *Dwyer* did a court relocate an express easement with a specifically defined location.

¶ 33. The cases *Dwyer* cites as adopting *Restatement (Third) of Property: Servitudes* § 4.8(3) evince a reluctance to relocate easements with a specifically agreed upon location. *See Burkhart v. Lillehaug,* 664 N.W.2d 41, 44 (S.D. 2003) (noting the course of the right-of-way easement was not "surveyed, platted with specificity, or otherwise clearly established"); *Roaring Fork Club, L.P. v. St. Jude's Co.,* 36 P.3d 1229, 1236 (Colo. 2001) ("under the Restatement, a burdened estate owner may unilaterally move an easement (*unless it is specified in deeds or otherwise to have a location certain*), subject both to a reasonableness test and to the constraints delimited in [§ 4.8(3)].") (emphasis added); *Lewis v. Young,* 705 N.E.2d 649, 658, 662 (N.Y. 1998) (noting that if the parties intended the location of the easement to be fixed and not subject to unilateral relocation they should have described it by metes and bounds rather than as a driveway "running in a generally southwesterly direction"); *Goodwin v. Johnson,* 591 S.E.2d 34, 37 (S.C. Ct. App. 2003) (relocating an ease-

21

ment of necessity while suggesting that express easements require mutual consent to be relocated).

¶ 34. *Dwyer*, therefore, appears to stand alone.[8] We decline to follow *Dwyer* because it would mean altering the longstanding default rule in Wisconsin that a servient estate cannot unilaterally relocate or terminate an express easement. Notably, even under the *Restatement (Third) of Property: Servitudes* § 4.8(3), parties can still prevent unilateral relocation by incorporating mutual consent requirements in their agreement. *See Restatement (Third) of Property: Servitudes* § 4.8(3) & cmt. a (noting the section merely supplies terms when omitted by the parties); *see also Dwyer*, 809 N.E.2d at 1058. The ability to contract around unilateral modification, as authorized by § 4.8(3), makes less convincing the argument that the interest in increased development of property should overcome the durability of easement rights. Accordingly, we conclude that parties need not include a provision in an express easement to prevent unilateral modification or relocation. Absent any mention of modification or relocation in the instrument creating an easement, the rule is that the owner of the servient estate cannot unilaterally modify an express easement. *See Lehner v. Kozlowski,* 245 Wis. 262, 266, 13 N.W.2d 910 (1944); *Guse,* 195 Wis. at 147–48.

¶ 35. We agree with the Kostermans and the courts that have rejected the *Restatement (Third) of Property: Servitudes* §§ 4.8(3) and 7.10(2) in favor of

---

[8] The Supreme Court of Vermont recently considered the *Dwyer* case and declined to follow it. *Sweezey v. Neel,* 2006 VT 38, 904 A.2d 1050, 2006 WL 1195462.

preventing the owners of servient estates from unilaterally relocating or terminating express easements. *See e.g., Herrin v. Pettengill*, 538 S.E.2d 735, 736 (Ga. 2000); *MacMeekin v. Low Income Hous. Inst., Inc.*, 45 P.3d 570, 579 (Wash. Ct. App. 2002); *see also Davis v. Bruk*, 411 A.2d 660, 665 (Me. 1980). These courts have rejected the position advanced by the *Restatement* as a threat to the certainty of property rights and real estate transactions, as a catalyst for increased litigation, and as a means for purchasers of servient estates to reap a windfall at the expense of owners of dominant estates. We agree that these reasons for rejecting the *Restatement*'s position are more compelling than the economic inefficiencies that might result from bilateral monopolies and holdout easement owners.[9]

¶ 36. Thus, although a handful of courts have adopted *Restatement (Third) of Property: Servitudes* § 4.8(3), these jurisdictions remain distinctly in the minority. Jon W. Bruce & James W. Ely, Jr., *The Law of Easements and Licenses in Land* § 7:16 at 7–31 to 7–33 (2001); *see Restatement (Third) of Property: Servitudes,* Introductory Note to ch. 4, at 496 (noting § 4.8(3) departs from the "common-law rule to adopt the civil-

---

[9] As Professor Epstein states:

Ownership is meant to be a bulwark against the collective preferences of others; it allows one, rich or poor, to stand alone against the world no matter how insistent or intense its collective preferences. To say that ordinary ownership presents a holdout problem is not to identify a defect in the system; it is to identify one of its essential strengths. If a holdout is adamant, no private party can *force* him to sell the land in question at any price. The state may intervene under its eminent domain powers, but only when it acts for 'public use,' and not for the narrow interests of B (or those whom he wishes to serve).

Richard A. Epstein, *Notice and Freedom of Contract in the Law of Servitudes,* 55 S. Cal. L. Rev. 1353, 1366–67 (1982).

law rule on relocation of easements."); *id.,* Introductory Note to ch. 7, at 336 (noting § 7.10 "provides for an expanded use of modification to permit more flexibility in adapting servitude arrangements to retain their utility over time.").

¶ 37. Moreover, the position articulated in *Restatement (Third) of Property: Servitudes* §§ 4.8(3) and 7.10(2) is inconsistent with longstanding precedent that Wisconsin courts do not balance the equities of adverse property owners when determining whether to grant or modify an easement. *See Schwab,* 224 Wis. 2d at 41–43; *Guse,* 195 Wis. 2d at 147. We decline to abandon this precedent.

¶ 38. Finally, vigorous academic debate persists over whether wise public policy warrants the extension of the changed conditions doctrine to easements.[10] On one hand, proponents of the *Restatement* position argue that judicial intervention is necessary to rectify the problem of holdouts, who could otherwise single-handedly impede economic development. *See e.g.,* Uriel Reichman, *Toward a Unified Concept of Servitudes,* 55 S. Cal. L. Rev. 1177, 1233 (1982); Susan F. French,

---

[10] In addition to the discussion of the changed conditions doctrine provided in the *Restatement (Third) of Property: Servitudes* (2000), see generally the symposium on servitudes presented in 55 Southern California Law Review 1177–1447. *See also* John V. Orth, *Relocating Easements: A Response to Professor French,* 38 Real Prop. Prob. & Tr. J. 643 (2004); Susan F. French, *Relocating Easements: Restatement (Third), Servitudes § 4.8(3),* 38 Real Prop. Prob. & Tr. J. 1 (2004); Note, *The Right of Owners of Servient Estates to Relocate Easements Unilaterally,* 109 Harv. L. Rev. 1693 (1996); Note, *Balancing the Equities: Is Missouri Adopting a Progressive Rule for Relocation of Easements?,* 61 Mo. L. Rev. 1039 (1996); Glen O. Robinson, *Explaining Contingent Rights: The Puzzle of "Obsolete" Covenants,* 91 Colum. L. Rev. 546 (1991).

*Toward a Modern Law of Servitudes: Reweaving the Ancient Strands,* 55 S. Cal. L. Rev. 1261, 1265, 1300 (1982); Note, *Balancing the Equities: Is Missouri Adopting a Progressive Rule for Relocation of Easements?,* 61 Mo. L. Rev. 1039, 1057–61 (1996). Conversely, opponents of the *Restatement* position contend that the uncertainty caused by judicial modification of easements does more to hamper economic development than does current law because the *Restatement* discourages investment by rendering property rights uncertain. *See e.g.,* Richard A. Epstein, *Covenants and Constitutions,* 73 Cornell L. Rev. 906, 914 (1987); Carol M. Rose, *Servitudes, Security, and Assent: Some Comments on Professors French and Reichman,* 55 S. Cal. L. Rev. 1403, 1412–13 (1982); Note, *The Right of Owners of Servient Estates to Relocate Easements Unilaterally,* 109 Harv. L. Rev. 1693, 1694–97 (1996).

¶ 39. Given the lack of consensus and lack of evidence that the changed-conditions doctrine produces superior economic and legal consequences, we reject the *Restatement*'s departure from the general rule that express easements cannot be unilaterally modified. We are not persuaded that the policy arguments are sufficiently compelling to justify overturning more than a century of precedent and upsetting the settled expectations of thousands of easement holders.

B. Did the 1998 Deeds Extinguish the 1961 Easement?

¶ 40. Alternatively, AKG contends the 1998 deeds extinguished the 1960 and 1961 easements. AKG's argument depends upon evidence extrinsic to the 1998 deeds, including the offer and counteroffer that preceded the completed transaction between the Chviliceks, the Trust, and AKG, the deposition testimony

of Edward Chvilicek, the deposition testimony of members of AKG, and the 2000 deed in which the Kostermans purchased the Dominant Estate from the Chviliceks.

¶ 41. There are two major flaws with AKG's argument. The first is that before extrinsic evidence of the parties' intent can be considered, the 1998 deeds between AKG and the Chviliceks, and between AKG and the Trust must be ambiguous with respect to the 1960 and 1961 easements. *See Rikkers,* 76 Wis. 2d at 188 ("where a deed is susceptible to only one interpretation, extrinsic evidence may not be referred to in order to show the intent of the parties"). We find it telling that AKG points to no such ambiguity. Moreover, upon inspection, the 1998 deeds demonstrate no ambiguity with respect to the preexisting easements. The 1998 deeds contain three references to right-of-way easements: (1) Both the warranty deed and the trustee deed conveyed the fee title to AKG except for "recorded and/or existing easements and right of way reservations . . . ." (2) In an exhibit to the 1998 deeds, the Chviliceks and the Trust reserved the 30–foot-wide public road easement, which overlapped the 1960 and 1961 easements.[11] (3) In the same exhibit, the Chviliceks and the Trust reserved another right-of-way easement for ingress and egress via Cobblestone Drive.

---

[11] Specifically, the deeds provide: "Reserving therefrom a private road easement . . . until such time as public road access is made available for said real estate upon the following described easement of right of way . . . ." Although the circuit court and court of appeals concluded this 1998 easement would terminate once the Dominant Estate received public road access, regardless of the location, we question this interpretation. If anything, use of the phrase "upon the following de-

¶ 42. Nothing in the language of the easements created by the 1998 deeds suggests that the 1960 and 1961 easements are being released. Nothing in the language of the easements created by the 1998 deeds makes reference to any preexisting easements. Moreover, the 1998 deeds explicitly except from the title conveyed to AKG all recorded easements. Since the 1960 and 1961 easements are recorded, the only reasonable interpretation of the 1998 deed is that the property AKG purchased was encumbered by the 1960 and 1961 easements, along with all other recorded easements.

¶ 43. If there is any doubt that the 1960 and 1961 easements survived, AKG's commitment for title insurance confirms that the property was encumbered by these earlier easements. Both easements are clearly listed as exceptions to the title conveyed. Absent ambiguity, we decline to consider the negotiations leading up to the 1998 deeds or the deposition testimony AKG offered for purposes of establishing intent. To do otherwise would jeopardize the certainty and authoritative status of recorded titles and land records. *Cf. Kordecki v. Rizzo,* 106 Wis. 2d 713, 718–19, 317 N.W.2d 479 (1982).

■

¶ 44. The second flaw in AKG's position is that even if the 1998 deeds were silent with respect to the 1960 and 1961 easements, silence does not terminate an express easement. *See Union Falls Power Co. v. Marinette County,* 238 Wis. 134, 141, 298 N.W. 598 (1941).

---

scribed easement" appears to suggest otherwise. Because the 1961 easement survives the 1998 deeds, however, we need not resolve this question.

The long-established rule is that an express easement "passes by a subsequent conveyance of the dominant estate without express mention in the conveyance." *Id.; Barkhausen v. Chicago, Milwaukee & St. Paul Ry. Co.*, 142 Wis. 292, 298, 124 N.W. 649 (1910); *Gojmerac*, 250 Wis. 2d 1, ¶ 25; *Krepel v. Darnell*, 165 Wis. 2d 235, 245, 477 N.W.2d 333 (Ct. App. 1991). Conversely, a servient estate remains burdened by a recorded express easement even when the easement is not expressly mentioned in the conveyance, since the purchaser has constructive notice of the easement. Jon W. Bruce & James W. Ely, Jr., *The Law of Easements and Licenses in Land* § 10:32, at 10–77 (2001). Thus, when AKG acquired title to the Servient Estate, the 1960 and 1961 easements burdened the property. Likewise, when the Kostermans acquired the Dominant Estate, the chain of title confirmed that the 1960 and 1961 easements remained appurtenant to the property. Accordingly, we reject AKG's argument that the 1998 deeds extinguished the 1960 and 1961 easements.

¶ 45. Although AKG couches its attack upon the easements burdening its land in terms of changed conditions, frustration of purpose, and subsequent easements extinguishing prior easements, we think AKG is really asking this court to relieve it of the duties placed upon every other buyer of real property. A buyer of real property is expected to determine the rights to the land he is about to purchase by consulting (1) the records in the office of the register of deeds; (2) other public records to discover rights which usually are not recorded in the office of the register of deeds, such as judgments and liens; and (3) the land itself. *Kordecki*, 106 Wis. 2d at 719 n.5. The testimony of all AKG members deposed reveals a failure to inspect the chain

28

of title to determine whether their development plans were consistent with the rights conveyed by the title to the Servient Estate. While not necessary to our holding, evidence of this omission by AKG bolsters our conclusion that the court of appeals should not have modified the 1961 easement to relieve AKG of the burden upon the Servient Estate.

## IV

¶ 46. Accordingly, we reverse the court of appeals. The 1961 easement will remain in effect even if AKG provides the Kostermans an alternative means of access to a public road, because the owner of a servient estate cannot unilaterally modify or terminate an express easement.

*By the Court.*—The decision of the court of appeals is reversed.

¶ 47. JON P. WILCOX, J., took no part.

¶ 48. SHIRLEY S. ABRAHAMSON, C.J. (*concurring*). I agree with the majority opinion that AKG Real Estate cannot get court approval to relocate or terminate the express easement without the consent of the Kostermans, the owners of the dominant estate.

¶ 49. The majority opinion, ¶ 1, however, states its holding and applicable rule of law too broadly. The majority opinion declares its holding that "the owner of a servient estate cannot unilaterally relocate or terminate an express agreement," period.[1] Not true! The majority opinion, ¶ 28, also overstates the applicable

---

[1] When the majority opinion speaks of "unilateral" action it means that the servient estate cannot get court approval of an act the servient estate wishes to take contrary to the wishes of the dominant estate.

rule as "even if AKG did provide alternate public road access to the [dominant estate], the 1961 easement would remain in force, because an express easement continues *regardless of whether the dominant estate needs the easement.*" (emphasis added).

¶ 50. Paragraph 29 in the majority opinion correctly explains that an express easement can terminate with the cessation of the particular purpose for which the easement was granted. *Niedfeldt v. Evans,* 272 Wis. 362, 364, 75 N.W.2d 307 (1956), clearly states this rule of law.

¶ 51. The court need not and should not decide whether to adopt Restatement (Third) of Property: Servitudes, § 4.8(3) or § 7.10(2). Neither provision applies in the instant case. Under § 4.8(3) the owner cannot make reasonable changes in the location of an easement if the change increases the burdens on the owner of the easement in its use and enjoyment.[2] Here the servient owner proposes extinguishing, not modifying, the easement. In any event, the owners of the dominant estate would be burdened.

¶ 52. Under § 7.10(2) of the Restatement a court may modify the servitude (easement) to permit other uses because of "changed conditions." "Changed conditions" is a stringent standard, including the concept that the servitude no longer serves its intended purpose.[3] Comment *a.* to § 7.10 explains that the doctrine is used sparingly:

> Because servitudes create property interests that are generally valuable, courts apply the changed-conditions

---

[2] 1 Restatement (Third) of Property: Servitudes § 4.8(3) (1998) is quoted at n.7 of the majority opinion.

[3] *See* 2 Restatement (Third) of Property: Servitudes § 7.10 illus. 4 (1998).

doctrine with caution. Of the many changed-conditions cases that have produced appellate decisions, few result in modification or termination of a servitude. The test is stringent: relief is granted only if the purpose of the servitude can no longer be accomplished. When servitudes are terminated under this rule, it is ordinarily clear that the continuance of the servitude would serve no useful purpose and would create unnecessary harm to the owner of the servient estate.[4]

¶ 53. Indeed, the owners of the dominant estate are persuasive in arguing that there were no changed conditions.[5]

¶ 54. Section 7.10(2) of the 1998 Restatement (Third) of Property: Servitudes is not as broad as the description of modifications of servitudes is in Professor French's 1982 law review article, entitled *Toward a Modern Law of Servitudes: Reweaving the Ancient Strands,* in 55 S. Cal. L. Rev. 1261 (often discussing injunctive relief), upon which the majority opinion relies.[6]

¶ 55. For the reasons set forth, I write separately. I join the concurring opinion of Justice ANN WALSH BRADLEY.

¶ 56. ANN WALSH BRADLEY, J. *(concurring).* I write separately because I think some basics have been lost in the shuffle.

---

[4] 2 Restatement (Third) of Property: Servitudes § 7.10 cmt. a. (1998)

[5] The Kostermans point out that the "changed condition" upon which the court of appeals relied was a Department of Transportation regulation that arguably prohibits AKG from building a public road on the easement path. Yet this regulation was, according to the Kostermans, adopted five years before the 1961 easement.

[6] Majority op., ¶ 20.

¶ 57. The 1961 easement is the pivotal easement in this case. That easement is an express easement granted "for purposes of ingress and egress." It still can be, and is, used for these purposes. Therefore, this case does not involve the concepts of impossibility or cessation of purpose.

¶ 58. Whether the Kostermans' use of the 1961 easement for its expressly-granted purpose remains "necessary" is irrelevant. *See Niedfeldt v. Evans,* 272 Wis. 362, 365, 75 N.W.2d 307 (1956) ("The rule that the right ceases with necessity has no application to ways acquired by express grant . . . ; a right to a way so created cannot be defeated by showing that the owners have another convenient and accessible way of going to and from their premises." (quoting 28 C.J.S., Easements, § 54, p. 718)); *accord Millen v. Thomas,* 201 Wis. 2d 675, 679, 550 N.W.2d 134 (Ct. App. 1996).

¶ 59. In addition, this case does not involve consent,[1] abandonment,[2] unity of ownership,[3] or any other precept of Wisconsin's common law that could operate to extinguish or relocate an express easement. Thus, unless this court were to modify current Wisconsin law, the 1961 easement must continue under the facts of this case.

¶ 60. In a future case, when impossibility is an issue, this court may well consider whether an express easement could be terminated when the purpose becomes impossible to accomplish. Impossibility is a high standard when properly defined. Such a standard, nev-

---

[1] *Guse v. Flohr,* 195 Wis. 139, 147, 217 N.W. 730, 733 (1928).

[2] *Pollnow v. DNR,* 88 Wis. 2d 350, 362, 276 N.W.2d 738 (1979).

[3] *Millen v. Thomas,* 201 Wis. 2d 675, 679, 550 N.W.2d 134 (Ct. App. 1996).

ertheless, would address the argument that a servient estate should not be bound in perpetuity when the purpose of the easement is impossible to achieve. The impossibility standard may provide an appropriate balance between the respective rights and interests of the dominant and servient estates.

¶ 61. For the reasons stated, I respectfully concur.

¶ 62. I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON joins this concurrence.